No. 90-131

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

LEE STOTT and BESSIE STOTT, and ALL WEST EQUIPMENT, and RICK STOTT,
      Plaintiffs and Appellants,
-vs-
RAYMOND FOX,
      Defendant and Respondent.

APPEAL FROM:    District Court of the Fifth Judicial District,
                In and for the County of Jefferson,
                The Honorable Frank Davis, Judge presiding.


COUNSEL OF RECORD:

                For Appellant:

                    John C. Doubek, Small, Hatch, Doubek & Pyfer,
                    Helena, Montana

                For Respondent:

                    Barry G. O'Connell, Moore, O'Connell, Refling &
                    Manos, Bozeman, Montana


                                    Submitted: July 13, 1990

                                    Decided: October 30, 1990

Filed:

                                    Clerk

Justice John C. Sheehy delivered the Opinion of the Court.

This legal malpractice action was brought by All West Equipment, Lee Stott, Bessie Stott, and Rick Stott. The plaintiffs allege that Raymond Fox failed to represent them properly in an action for a deficiency judgment brought by First Bank Western. Specifically, plaintiffs contend that Fox was negligent in stipulating to the dismissal of the Bank's deficiency judgment action with prejudice, having failed to explain to the plaintiffs the effect of the dismissal upon the plaintiffs' alleged claims against the Bank under various lender liability theories.

After the District Court dismissed the deficiency action, on October 15, 1985, the Stotts and All West Equipment, with different counsel, filed a complaint in the Fourth Judicial District against First Bank alleging fraud, misrepresentation, and breach of the covenant of good faith and fair dealing on the part of First Bank in making the loans to them and in obtaining their signature for the release of collateral. The plaintiffs also alleged that the collateral was sold without commercial reasonableness and that First Bank violated the requirements set out in § 30-9-504, MCA.

First Bank filed a motion to dismiss, which was denied by the District Court. When the District Court denied First Bank's motion to dismiss, it sought a writ of supervisory control from this Court. First Bank v. Fourth Judicial District Court (1987), 226 Mont. 515, 737 P.2d 1132. We granted First Bank's petition for writ of supervisory control, and dismissed the plaintiffs'

2

complaint. In that case, we held the plaintiffs' claims were barred by the stipulated dismissal with prejudice of the Bank's deficiency judgment action. Confronted with the dismissal of their second action, plaintiffs instituted the malpractice suit against their former counsel Fox. The Fifth Judicial District Court, Jefferson County, entered summary judgment in favor of defendant Fox on the plaintiffs' claim of legal malpractice. Now the plaintiffs appeal the District Court's summary judgment in favor of Fox. We affirm.

The parties raise the following issues on appeal:

1. Did the District Court err by finding that Lee and Bessie Stott were not the real parties in interest in the underlying lender liability action?

2. Did the District Court err by finding that an attorney-client relationship did not exist between Rick Stott and Raymond Fox?

3. Did the District Court err by finding that plaintiffs could not have prevailed on their claim for damages allegedly caused by the loss of the Massey-Ferguson dealership?

4. Did the District Court err in finding that Bank did not act in bad faith in its contractual relationship with the plaintiffs?

In order to determine whether Fox was guilty of legal malpractice, we must first examine the facts surrounding Fox's earlier representation of the plaintiffs in First Bank's deficiency judgment action against the plaintiffs.

3

All West Equipment was incorporated in 1971. Lee and Bessie Stott were officers of All West Equipment and spouses. Rick Stott, the son of the Stotts, was an employee of All West Equipment.

All West engaged in the sale and repair of farm implements. All West was a dealer for Massey-Ferguson. On October 18, 1982, Massey-Ferguson terminated All West's dealership, when Massey-Ferguson received a nonsufficient funds check from All West and further investigation revealed that All West was "out of trust" exceeding $50,000.

All West began its relationship with First Bank in late 1980. Two loans were originally made to All West by First Bank. A number of Security agreements were entered into between First Bank and All West to perfect First Bank's position. The Stotts also executed a guaranty with First Bank. Furthermore, a "Corporate Authorization Resolution" was executed identifying Lee and Bessie Stotts as corporate officers and having the right to borrow funds.

In June of 1987, All West was in arrears on its debt retirement to First Bank. For that reason, the parties reduced All West's indebtedness to two demand notes. Specifically, First Bank loaned to All West and Lee Scott (individually) $68,732.30, due in September, 1982. Also, First Bank loaned $21,566.63 to All West. The second loan was due December 15, 1982.

The Stotts and All West defaulted on both of these notes. The Bank also discovered that All West was dealing out-of-trust with Massey-Ferguson. As the record reflects, the out-of-trust dealings were discovered on October 15, 1982. Later, possession of the

4

collateral was turned over to First Bank, by a written instrument dated October 20, 1982, and signed by Lee and Rick Stott on behalf of All West Equipment.

The assets of All West, pledged as collateral, were sold at a public and private sale through Gardener Auction on November 13, 1982. As a result of the sales, almost $31,000 was applied to All West's indebtedness on the operating note, leaving a balance due on the loan of $42,088. On January 7, 1983, First Bank filed a complaint, in the Fourth Judicial District Court, against All West Equipment and Lee and Bessie Stott, to collect deficiencies owing after the sale of the collateral under the promissory notes and guaranty. Eventually, the deficiency action between First Bank and All West and the Stotts was settled without trial and a stipulation and order of dismissal with prejudice was filed on January 4, 1984.

In reviewing an order for summary judgment, the standard of review for this Court is the same as that used by the District Court under Rule 56(c), M.R.Civ.P. Kronen v. Richter (1984), 211 Mont. 208, 211, 683 P.2d 1315, 1317. Therefore, we may find summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), M.R.Civ.P.; Mayer Bros. v. Daniel Richards Jewelers, Inc. (1986), 223 Mont. 397, 399, 726 P.2d 815, 816. Once the record discloses no genuine issue of material fact, the burden of proof shifts to the party opposing the motion to

5

present facts of a substantial nature that a material fact issue does exist. Mayer, 726 P.2d at 816. The party opposing summary judgment may not rest upon mere allegations in the pleadings or conclusory statements in the briefs but has an affirmative duty to respond by affidavits or sworn testimony with specific facts that show a genuine factual issue exist. Mere conclusory or speculative statements are insufficient to raise a genuine issue of material fact. National Gypsum Co. v. Johnson (1979), 182 Mont. 209, 212, 595 P.2d 1188, 1189. Mayer, 726 P.2d at 816; citing Rule 56(e), M.R.Civ.P. Further, the District Court judge is not required to anticipate possible proof at trial when ruling on a summary judgment motion. Tucker v. Trotter Treadmills, Inc. (1989), 239 Mont. 233, 235, 779 P.2d 524, 525.

In a legal malpractice action, the complaining party, in order to prevail:

> [M]ust initially establish the existence of an attorney-client relationship. The plaintiff must then establish that the acts constituting the negligence . . . occurred, proximately causing damages to the plaintiff. The final requirement for the plaintiff is the need to establish, "[t]hat 'but for' such negligence . . . the client would have been successful in the prosecution or defense of the action."

Lorash v. Epstein (1989), 236 Mont. 21, 24, 767 P.2d 1335, 1337; citing Christy v. Saliterman (1970), 228 Minn. 144, 179 N.W.2d 288, 293-94.

In order for All West and the Stotts to prevail against Fox, they must show that their underlying action against First Bank would have been successful. Some courts, in describing this procedure, have termed it as a "suit within a suit." Liberman v.

6

Employers Insurance of Wausau (1980), 84 N.J. 325, 419 A.2d 417, 426. The District Court found that "the plaintiffs have failed to meet the burden that they could have prevailed in any counterclaim against First Bank. The legal malpractice test of Lorash has not been met." We agree with the District Court's holding that the plaintiffs' claims against the Bank would have not been successful.

I.

**Did the District Court err by finding that Lee and Bessie Stott were not the real parties in interest in the underlying action?**

The District Court found that Lee and Bessie Stott were not proper parties, in the former liability action, nor could they have personally asserted a claim for damages in the dismissed action. The District Court, relying on our holdings in Moats Trucking Co., Inc. v. Gallatin Dairies, Inc. (1988), 231 Mont. 474, 753 P.2d 883, and Bottrell v. American Bank (1989), 237 Mont. 1, 773 P.2d 694, explained that the alleged damages could only have been claimed by All West Equipment, the Stotts' corporation.

The District Court is correct. This issue is controlled by our holdings in Moats and Bottrell. In Moats, we said:

> In Malcolm v. Stondall Land Co. (1955), 129 Mont. 142, 145, 284 P.2d 258, 260, this Court stated the general rule regarding a stockholder's personal right to sue in the corporation's cause of action:
>
> . . . As a general rule stockholders may not sue upon a cause of action belonging to their corporation whether in their own names or in the name of the corporation itself.
>
> In Malcolm, this Court addressed for the first time the issue of whether individual shareholders who control all

7

of the stock of the corporation may disregard the corporate entity and sue as individuals on the corporation's cause of action. We held that such individual shareholders do not have the right to pursue an action on their own behalf when the cause of action accrues to the corporation. Malcolm, 129 Mont. at 146, 284 P.2d at 260.

The plaintiffs rely on the fact that as guarantors of the corporate debt of All West Equipment that they should have standing. As the District Court properly noted this contention has been rejected by this Court in Bottrell. In Bottrell, individual shareholders asserted they should be entitled to individual compensatory damages based on the fact they were required to sign personal guarantees of the corporate debt. We affirmed our holding in Moats, and found the cause of action belonging to the Corporation and not the shareholders. Bottrell, 773 P.2d at 709-10.

Recently, in Wolstad v. Northwest Bank (Mont. 1989), 783 P.2d 1325, 1328, 46 St.Rep. 2160, 2164, we reiterated our prior holding in Bottrell:

> We previously held that when corporate shareholders personally guarantee corporate debts, the shareholders may not recover as individuals for the lender's breach of the covenant of good faith and fair dealing and negligent misrepresentation absent a separate duty owed to the shareholders. Bottrell, 773 P.2d at 709.

The evidence overwhelmingly supports the District Court's conclusions "that individual stockholders (Stotts) do not have a right to pursue an action on their own behalf when the cause of action accrues to the corporation." A review of the notes identifies the borrower as "All West Equipment" signed by "Lee Stott as President." The demand note in the amount of $68,732.30

8

is likewise signed by Lee Stott individually although that is of no significance in view of the existence of guarantees signed by the Stotts with First Bank, and our earlier holdings in <u>Bottrell</u> and <u>Walstad</u>.

To permit this litigation to go forward as to Lee and Bessie Stott, is to permit "reverse piercing of the corporate veil," thus allowing the shareholders "to invoke the corporate entity only when it would be to their advantage." <u>Moats</u>, 753 P.2d at 885. Bessie Stott or Rick Stott may not recover under this theory since they were not signatories to either promissory note.

Next, Lee and Bessie Stott argue that All West was not a corporation in 1982 since it was dissolved in 1979 for failure to register, thereby entitling them to proceed individually. However, All West held itself out as a corporation in its dealings until the very end and took full advantage of the corporate structure. The District Court in its order found that:

> It is not disputed that after ALL WEST'S corporate existence had technically expired, it acted as a corporate entity. Among other things it prepared and filed corporate tax returns, issued corporate resolutions, borrowed money, issued corporate notes and security agreements to secure payment of the same. It generally held itself out to be a corporation to the Court, the Bank, its own accountants and to the world.

For the above reasons, this Court is compelled to conclude the Stotts are estopped from challenging All West's corporate status. "An organization that has held itself out as a corporation is estopped from denying the legality of its corporate existence." 18A Am.Jur.2d <u>Corporations</u> § 269.

9

Furthermore, the District Court considered the possibility that a material fact might exist as to the precise nature of the business entity of All West (i.e. sole proprietorship or partnership.) The District Court found that the Stotts failed to comply with the fictitious name statute (§ 30-13-203, MCA), and are thus barred from maintaining a suit or action by § 30-13-215, MCA. We agree with the District Court.

## II.

**Did the District Court err by finding that an attorney-client relationship did not exist between Rick Stott and Fox?**

We have held that a plaintiff, in a legal malpractice action, "must initially establish the existence of an attorney-client relationship." Lorash, 767 P.2d at 1337. There was never an attorney-client relationship between Rick Stott and Fox. Rick's right to recover is premised upon Fox's allegedly negligent handling of First Bank's deficiency judgment action. The parties in that dismissed action were First Bank as plaintiffs, and All West Equipment, a corporation and Lee and Bessie Stott as defendants. Rick Stott, a plaintiff in this action was not a party to the dismissed action. These facts negate the existence of an attorney-client relationship between Rick Stott and Fox.

## III.

**Did the District Court err by finding that plaintiffs could not have prevailed on their claim for damages allegedly caused by the loss of the Massey-Ferguson dealership?**

One of the claims in the dismissed action was damages for the loss of the Massey-Ferguson farm equipment dealership, which plaintiffs attributed to the wrongful acts of First Bank. To support their contention the plaintiffs rely upon the affidavit of Lee Stott. In his affidavit Lee Stott swears that the Bank advised him to terminate the dealership. According to Lee, "The intent of doing this was to, again, free up funds for the Bank and to allow the Bank to better situate its collateral and become more secure in its position. The promise made by Dan Simpkins was that the Bank would continue to finance our family business." In his prior deposition testimony he says just the opposite. In his deposition, he testified the bank never advised him of the day-to-day operations and management of his business. The District Court, relying on Wilson v. Westinghouse (8th Cir. 1988), 838 F.2d 286, found that Lee Stott's contradiction between his deposition testimony and his affidavit did not create a genuine issue of material fact. The court in Wilson stated:

> While the district courts must exercise extreme care not to take genuine issues of fact away from juries, '(a party should not be allowed to create issues of credibility by contradicting his own earlier testimony' . . . Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplementing previous depositions ad hoc with a new affidavit, and no case would ever be appropriate for summary judgment.

Wilson, 838 F.2d at 289.

We agree with the District Court. The plaintiffs can not make a material issue of fact, regarding the farm dealership, through the use of his own contradictory testimony. Furthermore, the record reveals the dealership franchise was terminated by Massey-Ferguson prior to any alleged fraudulent action of the Bank. Thus, the Bank, despite Lee Stott's affidavit, could not have played a part in All West's loss of the Massey-Ferguson farm dealership.

IV.

**Did the District Court err in finding that the Bank acted in bad faith in its contractual relationship with the plaintiffs?**

The plaintiffs contend that the District Court erred in finding that the Stotts' promissory notes were overdue. The Stotts contend that a special relationship existed between the Bank and themselves, and therefore the foreclosure constituted a breach of the covenant of good faith and fair dealing. Notwithstanding Lee Stott's affidavit, his deposition testimony reflects a strictly contractual banking relationship:

Q. Can you tell me during your relationship with Mr. Simpkins whether or not he advised you on the day-to-day operations of the business?

A. No, he never did.

Q. Did he ever advise you as to long-term goals for the business?

A. No.

Q. Did he ever advise you as to capitalization of the business?

A. No.

Q. Ever advise you on management decisions in the business?

12

A.  No.

Q.  Did he take an interest in the business other than that of just a lender of money?

A.  Not really, no.

. . .

Q.  Did Mr. Simpkins ever take any part in the stocking of inventory and the decision integral to that?

A.  No.

Q.  And did he give you any advice as to the level of inventory that should be kept?

A.  No.

Q.  Did he ever advise you as to your expansion plans?

A.  No.

The relationship of the parties in the summer of 1982 was governed by the promissory notes and security agreements.  The notes provided that upon any default in payment, "The holder of this note may at its option without notice declare this note immediately due and payable for the entire principal hereof plus accrued interest . . ."  The notes, likewise, provide that any default under the provisions of any security agreement is a default under the notes.  The record is clear that All West failed to make the payments.

The security agreements executed by All West state in pertinent part:

9.  The occurrence of any of the following events shall constitute a Default:  (a) failure of Borrower, or of any co-maker, indorser, surety or guarantor to pay when due any amount payable under any of the Secured Obligations: (b) failure to perform any agreement of Borrower contained herein; (c) any statement, representation, or

13

warranty of Borrower made herein or any time furnished to the Bank is untrue in any respect as of the date made; (d) entry of any judgment against Borrower; (e) appointment of a receiver for, loss, substantial damage to, destruction, theft, sale or encumbrance to or of any portion of the Collateral, or the making of any levy, seizure, or attachment thereof; (f) Borrower becomes insolvent or unable to pay its debts as they mature or makes assignment for the benefit of its creditors or any proceeding is commenced by or against Borrower alleging that it is insolvent or unable to pay its debts as they mature; (g) death of any Borrower who is a natural person or of any partner of any Borrower which is a partnership; (h) dissolution, consolidation or merger, or transfer of a substantial part of the property of any Borrower which is a corporation or a partnership; (i) such a change in the condition or affairs (financial or otherwise) of Borrower or any co-maker, indorser, surety or guarantor of any of the Secured Obligations as in the opinion of the Bank impairs the Bank's security or increases its risk; or (j) the Bank deems itself insecure for any reason whatsoever.

10. Whenever a Default shall exist, the Bank may, at its option and without demand or notice, declare all or any part of the Secured Obligations immediately due and payable, and the Bank may exercise, in addition to the rights and remedies granted hereby, all rights and remedies of a secured party under the Uniform Commercial Code or any other applicable law. The sheriff of any county wherein the Collateral or any part thereof is located is authorized at the request of the Bank and upon delivery of the security agreement, to take possession of the Collateral and sell the same as provided by Law.

11. Borrower agrees, in the event of Default, to make the Collateral available to the Bank at a place or places acceptable to Bank, and to pay all costs of the Bank, including reasonable attorneys' fees, in the collection of any of the Secured Obligations and the enforcement of any of the Bank's rights. If any notification of intended disposition of any of the Collateral is required by law, such notification shall be deemed reasonably and properly given if mailed at least ten (10) days before such disposition, postage prepaid, addressed to the Borrower at the address shown below.

First Bank by virtue of the provisions of the notes, security agreements and the actions of All West, had the right to declare the loans due and take possession of its collateral. Its actions

14

not arbitrary, capricious or unreasonable. It loaned the money to All West and when All West defaulted and was also terminated by its major supplier, Massey-Ferguson, the Bank took action necessary to secure the pledged collateral. The Bank obtained the consent of All West and the Stotts to repossess the collateral. Stotts' claim that they do not remember signing the documents relinquishing the collateral or that they only signed blank pieces of paper are conclusory assertions not supported by the evidence.

The relationship between plaintiffs and First Bank was contractual in nature and arose out of the Uniform Commercial Code. Under the Code, every contract or duty within the Code imposes an obligation of good faith in its performance or enforcement. Section 30-1-203, MCA. "Good faith" is defined in the Code as "honesty in fact in the conduct or transaction concerned." Section 30-1-201(19), MCA. The above facts, amply demonstrate the Bank dealt in good faith with All West Equipment and the Stotts.

Under the law applicable at the time, "the nature and extent of an implied covenant of good faith and fair dealing is measured in a particular contract by the justifiable expectations of the parties. Where one party acts arbitrarily, capriciously or unreasonably, that conduct exceeds the justifiable expectations of the second party." Nicholson v. United Pacific Insurance Co. (1985), 219 Mont. 32, 41-42, 710 P.2d 1342, 1348. Clearly, under Nicolson, a breach of the implied covenant of good faith and fair dealing requires the breaching party to conduct itself in an impermissible activity, and in doing so, to act arbitrarily,

15

capriciously or unreasonably.   In this case, evidence of the implied breach is missing.   The Bank here had the right to terminate its financing as long as it did so reasonably and not capriciously.   Despite the plaintiffs bare allegations to the contrary, the Bank, from the evidence in this case, did act reasonably and not capriciously or arbitrary.

We affirm.

_____
John C. Sheehy
Justice

We Concur:

_____
Chief Justice

_____
John C. Harrison

_____
R. C. McDonough

_____
Diane G. Barz
Justices