JUSTICE NELSON
dissents.
I. Introduction
¶78 I believe that the “first-party” theory of liability set forth in Justice Cotter’s Dissent-that Redies was Addy’s client-was the correct approach for analyzing Redies claims against Addy. Thus, the contention that an attorney retained by a conservator does not also *259 represent the protected person-though the attorney was retained specifically to advise or assist the conservator in the administration of the protected person’s estate-was not “a reasonable basis in law” under § 33-18-242(5), MCA, for contesting the protected person’s legal malpractice claim. I therefore disagree with the Court’s first-party analysis (¶¶ 37-38)-especially here, where Addy, while representing Cosner, signed a document as “Attorney for Ms. Redies” and stated in a letter to Redies’ creditors that “I represent the Estate of Janet Redies.” See ¶ 72 of Justice Cotter’s Dissent. Indeed, ALPS should be bound by Addy’s admissions. For these reasons, I join Justice Cotter’s Dissent.
¶79 Given this conclusion, it is not necessary to reach Redies’ “third-part/’ theory of liability against Addy. However, because the Court, in my view, makes a critical error in its analysis of ALPS’s proffered defense under this theory, it is important to explain why the contention that an attorney retained by a conservator does not owe a duty of care to the protected person also was not “a reasonable basis in law” under § 33-18-242(5), MCA. In this regard, I agree, for the most part, with the Court’s preliminary discussion of this issue. In particular, I agree that our decision depends on the legal landscape as it existed during the negotiations which took place in 2001 and 2002 (¶ 29); I agree that the reasonableness of ALPS’s defense is a question of law (¶¶ 30-35); I agree that Watkins Trust v. Lacosta, 2004 MT 144, 321 Mont. 432, 92 P.3d 620, does not dictate the outcome of this case (¶¶ 39-40); and I agree that an insurer’s proffered defense (on behalf of its insured in the underlying action) is not reasonable per se just because this Court has not yet rejected the defense explicitly (¶¶ 41-43).
¶80 The point at which I part ways with the Court is its assessment of the legal landscape that existed in late-2001 and 2002. In my view, the Court improperly discounts the advanced progression of our caselaw toward holding a professional liable to third parties whose interests may be expected to be affected by the professional’s negligent performance of a contract.
¶81 Furthermore, I disagree with the Court’s assessment of ALPS’s arguments under our then-existing precedents. Even if it was reasonable for ALPS to rely solely on the multi-factor balancing test set forth in Trask v. Butler, 872 P.2d 1080, 1083 (Wash. 1994), as a defense to Redies’ third-party theory of liability against Addy, the Court errs in concluding that ALPS’s actual application of that test was reasonable. To the contrary, ALPS’s analysis (on Addy’s behalf) was incomplete, contrary to the facts of this case, and thus *260 unreasonable. I therefore do not agree that ALPS proffered “a reasonable basis in law” for contesting Redies’ third-party theory, and I conclude that summary judgment in favor of ALPS was not proper in this case.
II. ALPS’s “Privity of Contract” Defense
¶82 In Addy’s brief in support of his motion for summary judgment in the underlying suit, ALPS relied on two theories: “privity of contract” and the Trask test. With respect to the former, it took the position that where the plaintiff is not in privity of contract with the defendant, she may not recover damages for the defendant’s negligent performance of the contract. Translated to the case at hand: Because Redies was not in privity with Addy, whose contract to provide legal services (under this third-party theory) was with Cosner, she could not recover damages for his allegedly negligent performance of that contract (advising Cosner to pauperize Redies instead of recommending the establishment of a self-sufficiency trust). According to ALPS, “Mr. Addy acted as attorney for Mr. Cosner, the Conservator and Ms. Uerling, the Guardian. That was the extent of his attorney-client relationships in this matter.”
¶83 Yet, twenty years before ALPS relied on this defense to Redies’ claims against Addy, we observed that “[t]his Court was a pioneer in abolishing privity as a requirement for recovery in a personal injury or wrongful death case.” Hawthorne v. Kober Const. Co., Inc., 196 Mont. 519, 523, 640 P.2d 467, 469 (1982) (citing Brandenburger v. Toyota Motor Sales, U. S. A., Inc., 162 Mont. 506, 513 P.2d 268 (1973)). We further stated:
We have not felt permanently bound to archaic legal concepts no matter how deeply rooted they may be. We view privity to be a concept having proper application in the area of contract law. There seems to be no sound public policy argument for extending its application to tort.
Hawthorne, 196 Mont. at 523, 640 P.2d at 469 (emphasis added). We then went on to adopt the following rule enunciated in Prosser, The Law of Torts § 93, at 622, 623 (4th ed., West 1971):
[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.
*261 ... [T]here are situations in which the making of the contract creates a relation between the defendant and the promisee, which is sufficient to impose a tort duty of reasonable care. By the same token, there are situations in which the making of a contract with A may create a relation between the defendant and B, which will create a similar duty toward B, and may result in liability for failure to act. [Emphasis added, footnote omitted.]
See Hawthorne, 196 Mont. at 523-24, 640 P.2d at 470 (quoting the foregoing text from Prosser, The Law of Torts § 93).
¶84 Consistent with Hawthorne, we have rejected the privity of contract defense in a variety of contexts. See, e.g., Tynes v. Bankers Life Co., 224 Mont. 350, 359-60, 730 P.2d 1115, 1121 (1986) (insurer liable in tort to insured’s father, notwithstanding the absence of privity (quoting Prosser’s rule)); Thayer v. Hicks, 243 Mont. 138, 149, 793 P.2d 784, 791 (1990) (accountant liable to third parties who he knows intend to rely upon his work product); Jim’s Excavating Service v. HKM Assoc., 265 Mont. 494, 502, 506, 878 P.2d 248, 253, 255 (1994) (project engineer or architect liable to third parties who foreseeably may rely on the information supplied by the engineer or architect (quoting Prosser’s rule)); Turner v. Kerin & Associates, 283 Mont. 117, 125-26, 938 P.2d 1368, 1373-74 (1997) (engineering firm liable to any party who holds or succeeds to a security interest in the property serviced by the firm (quoting Prosser’s rule)).
¶85 Thus, by 2001, it was firmly established in our caselaw that the requirement of privity of contract to maintain an action in tort had been abolished. Indeed, in Jim’s Excavating we rejected the defendant’s privity argument precisely because it ignored “the established law in Montana abolishing the requirement of privity of contract to maintain an action in tort.” Jim’s Excavating, 265 Mont. at 502, 878 P.2d at 253 (emphasis added). And attorney malpractice actions were no exception. In Rhode v. Adams, 1998 MT 73, 288 Mont. 278, 957 P.2d 1124, we observed that an attorney may owe a duty to someone other than his or her client, at least in nonadversarial contexts. See Rhode, ¶¶ 12-17. This observation was consistent with, our adoption of Prosser’s rule in Hawthorne (though we did not cite Prosser in Rhode), and it confirmed that privity of contract is not required to maintain a malpractice action against an attorney.
¶86 It is not surprising, therefore, that none of the authorities proffered by ALPS in the underlying action supports the argument that privity-notwithstanding our consistent and repeated rejections of the concept in Hawthorne, Tynes, Thayer, Jim’s Excavating, Turner, *262 and Rhode-was, nevertheless, still required to maintain an attorney malpractice action. ALPS cited Grenz v. Prezeau, 244 Mont. 419, 798 P.2d 112 (1990), in Addy’s motion for summary judgment, for the proposition that “[ejssential to a malpractice action is proof that an attorney-client relationship existed.” On appeal, ALPS cites Stott v. Fox, 246 Mont. 301, 805 P.2d 1305 (1990), and Carlson v. Morton, 229 Mont. 234, 745 P.2d 1133 (1987), for the same proposition. But Grenz, Stott, and Carlson do not stand for a rule that a plaintiff must have “privity of contract” with the defendant-attorney in order to maintain a malpractice action.
¶87 To the contrary, we stated in Carlson that “[ijn any professional negligence action, the plaintiff must prove that the professional owed him a duty, that the professional failed to live up to that duty, thus causing damages to the plaintiff.” Carlson, 229 Mont. at 238, 745 P.2d at 1136 (emphasis added). Quoting some of this language from Carlson in Merzlak v. Purcell, 252 Mont. 527, 830 P.2d 1278 (1992), we explained as follows:
Attorney malpractice is professional negligence. In order to recover in a professional negligence action, “the plaintiff must prove that the professional owed him a duty, and that the professional failed to live up to that duty, thus causing damages to the plaintiff.”
Merzlak, 252 Mont. at 529, 830 P.2d at 1279 (emphasis added) (quoting Lorash v. Epstein, 236 Mont. 21, 24, 767 P.2d 1335, 1337 (1989), in turn quoting Carlson, 229 Mont. at 238, 745 P.2d at 1136); accord Hauschulz v. Michael Law Firm, 2001 MT 160, ¶ 11, 306 Mont. 102, ¶ 11, 30 P.3d 357, ¶ 11 (“To recover damages in a legal malpractice claim, a plaintiff must establish each of the following elements: first, that the professional owed him a duty of care-, ...” (emphasis added) (citing Merzlak, 252 Mont. at 529, 830 P.2d at 1279)).
¶88 Thus, our statement in Grenz, 244 Mont. at 426, 798 P.2d at 116, and Stott, 246 Mont. at 305, 805 P.2d at 1307, that a plaintiff in a legal malpractice action must establish that “an attorney-client relationship” existed was not a resurrection of the long-discarded requirement of privity of contract. Rather, it was another way of stating that the plaintiff must establish that the defendant owed her a duty of care. Notably, ALPS effectively conceded this point in the underlying action. Immediately after asserting in Addy’s summary judgment motion that “[ejssential to a malpractice action is proof that an attorney-client relationship existed,” ALPS went on to explain as follows: “Put another way, the Plaintiff must establish that the professional owed him a duty *263 of care.” (Emphasis added, citing Hauschulz.) Therefore, the flaw in ALPS’s position that Addy had no duty to Redies (because he was retained by Cosner) was the mistaken premise that “attorney-client relationship” means “privity of contract.” To the contrary, as our then-existing caselaw established, the requirement of privity to maintain an action in tort had been abolished. Accordingly, a defense that used the long-discarded concept of privity as a template was not “a reasonable basis in law” for contesting Redies’ third-party theory.
III. Three Approaches for Ascertaining Duty to Third Parties
¶89 The specific question ALPS faced in evaluating Redies’ third-party theory of liability against Addy, therefore, was not whether the two of them were in privity but, rather, whether he owed her a duty of care. In this regard, having acknowledged that “[s]ome courts ... have extended the duty of an attorney to certain non-clients,” ALPS proffered a second theory in support of Addy’s motion for summary judgment-namely, that such a duty should not be extended to a protected person in a conservatorship. As support for this position, ALPS relied solely on the Trask multi-factor balancing test. Yet, given our equivocal language in R/iode-specifically, that “a multi-factor balancing test, such as that set out in Trask, may be effective when used to address the duties of attorneys in transactional matters or estate planning and probate practice,” Rhode, ¶ 17 (emphasis added)-it was not reasonable for ALPS to ignore completely, as it did, then-existing alternative approaches for ascertaining the duty of care owed by a professional to third parties.
¶90 Again, the rule enunciated by Prosser and adopted by this Court in Hawthorne provides as follows:
[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.
Prosser, The Law of Torts § 93, at 622. Given our reaffirmations of this rule in Tynes, 224 Mont. at 359-60, 730 P.2d at 1121, Jim’s Excavating, 265 Mont. at 502, 878 P.2d at 253, and Turner, 283 Mont. at 125-26, 938 P.2d at 1373-74, it cannot be disputed that the rule was firmly established in our caselaw by 2001.
¶91 However, we have not always invoked Prosser’s rule for *264 ascertaining whether a professional owed a duty of care to a nonclient. For instance, in Thayer, we considered three different approaches for determining the extent of an accountant’s duty of care to third parties: “The first approach limits the duty of care to those third parties who are actually known to the accountant, the second limits the duty to those who are actually foreseen and the third expands the duty to all those who are reasonably foreseeable.” Thayer, 243 Mont. at 144, 793 P.2d at 788 (emphases added). Ultimately, given the facts of the case, we applied a modified version of the first approach:
[An accountant’s duty of care to third parties with whom he is not in privity of contract] exists only if the accountant actually knows that a specific third party intends to rely upon his work product and only if the reliance is in connection with a particular transaction or transactions of which the accountant is aware when he prepares the work product.
Thayer, 243 Mont. at 149, 793 P.2d at 791 (emphases added). Notably, this approach is consistent with Prosser’s observation that the incidental fact of the existence of a contract between the defendant and A does not negative the defendant’s responsibility when he enters upon a course of affirmative conduct “which may be expected to affect the interests of another person.” Prosser, The Law of Torts § 93, at 622.
¶92 With respect to attorneys, we stated in Rhode that “a multi-factor balancing test, such as that set out in Trask, may be effective when used to address the duties of attorneys in transactional matters or estate planning and probate practice.” Rhode, ¶ 17. (We further clarified that “this model is not appropriate to define an attorney’s duties while representing clients in adversarial proceedings.” Rhode, ¶ 17.) Yet, while we did not identify Thayer or Prosser’s rule in Rhode, we did not reject these approaches either. Thus, for the purpose of ascertaining in 2001 and 2002 whether an attorney owes a duty of care to a nonclient, our long-standing endorsement of Prosser’s rule and our actual-knowledge-of-intent-to-rely approach in Thayer were still essential considerations.
¶93 Indeed, when we ultimately held in Watkins Trust that a drafting attorney owes a duty to nonclient beneficiaries named in the drafted instrument, we cited cases representing all three approaches. Specifically, we explained that “a finding of duty is consistent with existing Montana law,” and we cited Rhode (the Trask multi-factor balancing test), Jim’s Excavating (Prosser’s rule), Turner (Prosser’s rule), and Thayer (the actual-knowledge-of-intent-to-rely approach), as examples. Watkins Trust, ¶ 22.
*265 ¶94 For these reasons, I cannot agree that ALPS proffered “a reasonable basis in law” for contesting Redies’ claims against Addy by relying on one of these approaches and completely ignoring the other two-particularly since the approach relied on by ALPS was the very one we had not actually adopted, having stated merely that it “may” be effective for ascertaining the duty owed by an attorney to a nonclient. (Indeed, at the outset of applying the Trask test in Addy’s motion for summary judgment, ALPS acknowledged that “the Supreme Court has not unequivocally adopted the multi-factor balancing test.”) Moreover, we had already applied Prosser’s rule, which is stated in general terms, in a variety of contexts.
IV. ALPS’s Application of the Trask Test
¶95 But even if it was reasonable for ALPS to rely on just the Trask multi-factor balancing test as a defense to Redies’ third-party theory of liability, ALPS’s actual application of that test did not constitute “a reasonable basis in law” for contesting her claims.
¶96 As we explained in Rhode, the multi-factor test involves a balancing of six factors: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant’s conduct and the injury suffered; (5) the policy of preventing future harm; and (6) the extent to which the profession would be unduly burdened by a finding of liability. Rhode, ¶ 14 (quoting Trask, 872 P.2d at 1083). (This test can be traced to Lucas v. Hamm, 364 P.2d 685, 687-88 (Cal. 1961).) We further explained that the important inquiry under the multifactor balancing test is “whether the attorney’s services were intended to affect the plaintiff.” Rhode, ¶ 14; see also Trask, 872 P.2d at 1083.[1]
¶97 In Addy’s motion for summary judgment, ALPS argued that “[ajlthough the Supreme Court has not unequivocally adopted the multi-factor balancing test, it is clear that even if it was applied, there would be no liability to Janet Redies under these circumstances.” ALPS then proceeded to apply the Trask test, as follows.
¶98 First, with respect to factor (l)-the extent to which the contract *266 between Addy and Cosner was intended to affect Redies-ALPS argued that “Redies was an incidental beneficiary, a relationship not close enough to satisfy that aspect of the multi-factor balancing test.” But how could Redies-the protected person in the conservatorship-possibly have been a mere “incidental” beneficiary when Addy was retained by Cosner specifically to render legal advice concerning the management and administration of Redies’ estate? ALPS’s assertion is preposterous, to say the least.
¶99 Section 72-5-427(3)(w), MCA, states:
A conservator, acting reasonably in efforts to accomplish the purpose for which he was appointed, may act without court authorization or confirmation to . . . employ persons, including attorneys, auditors, investment advisors, or agents, even though they are associated with the conservator, to advise or assist him in the performance of his administrative duties; act upon their recommendation without independent investigation', and instead of acting personally, employ one or more agents to perform any act of administration, whether or not discretionary.... [Emphases added, paragraph break omitted.]
That is precisely what took place here.
¶100 Indeed, in April 2002, Cosner completed an affidavit in which he stated that “Mr. Addy assisted me in performing my duties as temporary conservator, and later as permanent conservator, as those duties are established under Montana law.” Cosner further stated that “in my capacity as temporary and permanent conservator, I relied on Mr. Addy’s counsel and advise [sic] in performing my duties,” and “I relied on Mr. Addy’s advice and recommendations on handling Ms. Redies’ estate, as evidenced and set forth in Mr. Addy’s letter of September 7, 1995.” (That is the letter in which Addy memorialized the management plan. See ¶ 9 n.2 of the Court’s Opinion.) Finally, and most significantly, Cosner concluded his affidavit with the following statement: “During the period [of] time I served as Ms. Redies’ temporary and permanent conservator of Ms. Redies’ estate, I did not retain Mr. Addy as my attorney for any purpose, personal or business, other than as identified above.” (Emphasis added.)
¶101 Addy never disputed that his services were retained by Cosner for the sole and specific purpose of advising Cosner regarding the management of Redies’ estate. Notably, Addy’s bills for legal services were paid not by Cosner, but by Redies’ estate. Thus, it was disingenuous to say the least-and perhaps even a flat-out misrepresentation of the facts-for ALPS to assert that Redies was a mere “incidental” beneficiary of Addy’s contract with Cosner. To the *267 contrary, the record firmly establishes that Addy’s services were intended to affect Redies.
¶102 Next in its analysis, ALPS omitted any discussion of factors (2) and (3)-the foreseeability of harm to Redies, and the degree of certainty that Redies suffered injury, respectively-both of which weigh heavily in favor of finding a duty of care. ALPS instead skipped ahead to factor (4)-the closeness of the connection between Addy’s conduct and the injury suffered by Redies. In this regard, ALPS argued as follows: “Mr. Addy had no authority to act on his own with regard to the Estate of Janet Redies. The only person with that legal authority was the Conservator, Mr. Cosner.” Thus, “Mr. Addy could not have performed any acts which were improper or caused harm to her since Mr. Addy’s actions take form only through the actions of the Conservator.” ALPS suggested that Redies’ proper and exclusive remedy was to sue Cosner.
¶103 Aside from the fact that this appears to be another privity argument, ALPS’s contentions were contrary to the record. Given that Cosner retained Addy solely and specifically to render legal advice concerning the management and administration of Redies’ estate, and given that Cosner in fact “relied on Mr. Addy’s advice and recommendations on handling Ms. Redies’ estate,” there clearly was a close connection-indeed, a direct conduit-between Addy’s conduct and Redies’ injury. Addy not only should have known, but in fact did know, that Cosner would be acting upon Addy’s recommendations, as Cosner was authorized to do by § 72-5-427(3)(w), MCA.
¶104 Moreover, it was absurd to suggest that Addy could hide behind Cosner under these circumstances. Cosner hired Addy precisely because he (Cosner) did not have the legal expertise to make certain administrative decisions concerning Redies’ estate. Addy could not be shielded from liability to Redies simply because it was Cosner-and not Addy-who implemented Addy’s advice and recommendations. (In this regard, it is not at all clear that Addy in fact did not have “authority to act on his own with regard to the Estate of Janet Redies,” given that § 72-5-427(3)(w), MCA, authorizes a conservator to “employ one or more agents to perform any act of administration, whether or not discretionary.”) Thus, ALPS’s assertion that “Addy had no authority to act on his own,” even if true, was both misleading and irrelevant.
¶105 Next, as with factors (2) and (3), ALPS omitted any discussion of factor (5)-the policy of preventing future harm, which also weighs in favor of finding a duty of care-and focused the remainder of its analysis on factor (6)-the extent to which the legal profession would be unduly burdened by a finding of liability. According to ALPS:
*268 Where a duty to a non-client creates a risk of divided loyalties because of conflicting interests, those considerations against finding duties to a non-client outweigh the other considerations. Trask, 872 P.2d at 1085. It is from this general rule that the Rhode court extracted its determination that there should not [be] a duty to a non-client where there are potentially adversarial proceedings.
That is truly the case here. There are currently adversarial proceedings between Janet Redies and her attorneys and Mr. Cosner, the Conservator, and his attorneys, including Mr. Addy. To hold Mr. Addy had duties to Janet Redies in addition to those of Mr. Cosner would create an irresolvable conflict of interest and division of loyalties for him.
ALPS also suggested that an “inherent conflict” exists between a protected person and the attorney retained by her conservator.
¶106 In Rhode, the adversarial proceeding which precluded a finding of duty was a contested child custody case, wherein the defendant-attorney represented one of the parents. Rhode, ¶¶ 3-8. We concluded that “if an attorney owes the same duty of care to both the parent and the children, he or she will be able to serve neither effectively.” Rhode, ¶ 21. In Trask, the adversarial proceeding which precluded a finding of duty was an attorney’s representation of the personal representative of an estate. Trask, 872 P.2d at 1081-82. The court concluded that a duty is not owed from an attorney hired by the personal representative of an estate to the estate or to the estate beneficiaries, in part because “[a] conflict of interest arises in estate matters whenever the interest of the personal representative is not harmonious with the interest of an heir” and, thus, “the unresolvable conflict of interest an estate attorney encounters in deciding whether to represent the personal representative, the estate, or the estate heirs unduly burdens the legal profession.” Trask, 872 P.2d at 1085.
¶107 In the case at hand, by contrast, there was no conflict of interest whatsoever between Cosner and Redies; in fact, Redies initially was comatose and then remained incapacitated at least until 1998, when she began to question the disposition of her assets. (In this regard, ALPS’s reliance on adversarial relationships that developed in 1998-three years after Addy had advised Cosner to pauperize Redies-is misplaced.) Had the opposite been true and an adversarial relationship had existed between Cosner and Redies, then he could not have served as her conservator. See §§ 72-5-423, 72-34-105, MCA. Thus, given the nature and purpose of a conservatorship-particularly, the fact that the interest of the conservator and the interest of the *269 protected person are, by definition, harmonious-Addy simply could not have faced an irresolvable conflict of interest in representing Cosner and Redies simultaneously. ALPS’s argument that the existence of a duty to Redies “would create an irresolvable conflict of interest and division of loyalties” for Addy was not only contrary to the foregoing statutes and devoid of merit, but also unreasonable.
¶108 In my view, a reasonable application of the Trask factors, in conjunction -with Prosser’s rule, leads to only one conclusion-that Addy owed Redies a duty of care. First, “in efforts to accomplish the purpose for which he was appointed,” Cosner employed Addy “to advise or assist him in the performance of his administrative duties.” See § 72-5-427(3)(w), MCA. This same provision authorized Cosner to “act upon [Addy’s] recommendation without independent investigation.” Section 72-5-427(3)(w), MCA. It cannot be disputed, therefore, that Addy’s services “[were] intended to affect the plaintiff [Redies].” (Factor 1.) Rhode, ¶ 14; Trask, 872 P.2d at 1083.
¶109 Likewise, it was certainly foreseeable that Redies would suffer harm-indeed, the type of harm that she in fact suffered here-if Addy advised or assisted Cosner negligently in the administration of Redies’ estate. (Factors 2 and 3.) And, as explained above, there was a direct connection between Addy’s conduct and Redies’ injury, since Cosner retained Addy to render legal advice concerning the administration of Redies’ estate and since Cosner, in fact, acted upon Addy’s advice and recommendations. (Factor 4.)
¶110 Next, given that a conservatorship exists “to promote the best interests of the protected person,” In re Estate of Bayers, 2001 MT 49, ¶ 14, 304 Mont. 296, ¶ 14, 21 P.3d 3, ¶ 14 (citing § 72-5-401 to -439, MCA), the policy of preventing the type of harm suffered by Redies from occurring to protected persons in the future weighs heavily in favor of a duty of care. (Factor 5.) Finally, a finding of liability would not unduly burden the legal profession. (Factor 6.) Indeed, the legitimate interests of a conservator are inseparable from those of the protected person. Cf. In re Guardianship of Karan, 38 P.3d 396, 401 (Wash.App. Div. 3 2002) (determining, under the Trask factors, that an attorney retained by a guardian owes a duty of care to the ward),
¶111 The record before us establishes that the raison d’etre for Addy’s providing legal advice to Cosner was to benefit Redies; Addy’s professional relationship with Cosner had no other purpose. Accordingly, by entering into this legal services contract with Cosner, Addy placed himself in such a relation toward Redies that the law imposed upon him an obligation, sounding in tort and not in contract, to act in such a way that Redies would not be injured. The incidental *270 fact that Addy was retained by Cosner, and not by Redies personally, did not negative Addy’s responsibility when he entered upon a course of affirmative conduct which clearly was expected-indeed, was intended-to affect Redies’ interests. This was the established law in 2001 and 2002; and under this established law, the inevitable conclusion is that Addy owed Redies a duty of care.
V. AT .PS’s Reliance on Watkins Trust
¶112 ALPS makes much of the fact that in Watkins Trust, we noted that “[t]he duty owed [by an attorney] to a nonclient beneficiary is a matter of first impression in Montana.” Watkins Trust, ¶ 21 (emphasis added). However, ALPS construes this language to mean something more than it did. A “case of first impression” is “[a] case that presents the court with issues of law that have not previously been decided in that jurisdiction.” Black’s Law Dictionary 206 (Bryan A. Garner ed., 7th ed., West 1999) (emphasis added). Thus, while we suggested in Rhode that an attorney, in nonadversarial contexts, may owe a duty to third persons to exercise care in the performance of services for his or her client, see Rhode, ¶¶ 12, 17, we actually found such a duty in Watkins Trust as “a matter of first impression’-notably, relying on Rhode in the process, see Watkins Trust, ¶¶ 21-22.
¶113 More to the point, the question here is not whether we had previously “decided” the defense proffered by ALPS in contesting Redies’ third-party theory of liability. Rather, as the Court observes in ¶ 43, the determinative question is whether that defense was “reasonable” under our then-existing precedents, given the progression in our caselaw toward holding an attorney liable to certain nonclients (as we finally did in Watkins Trust). For the reasons set forth above, the answer to this question is “No.” Our caselaw as of 2001 and 2002-including Thayer, Jim’s Excavating, Turner, and N/iode-unmistakably foreshadowed our holding in Watkins Trust-, the only thing remaining at that point in time was for us to make the holding explicit, as we might well have done in Redies v. Addy, had the case been taken to trial and appealed to this Court.
¶114 Indeed, in the same way that Thayer and Jim’s Excavating announced new rules with respect to accountants and engineering firms, respectively, Redies v. Addy could have been the Watkins Trust case with respect to attorneys, had the parties not settled. Our cases certainly were headed in that direction. For this reason, although this Court had not yet found a duty running from an attorney to a nonclient by 2001 and 2002, ALPS nonetheless, in evaluating Redies’ claims against Addy and deciding whether to contest those claims, had to weigh the likelihood that the District Court would find such a duty *271 under our then-existing precedents (as Judge Baugh ultimately did) and that this Court would affirm that finding.
¶115 This is not to say that an insurer must accurately predict future holdings of this Court. Rather, it is an acknowledgement of the standard to which the insurer is held: reasonableness. As the Court notes in ¶ 41, a tort defendant and his or her insurer should be able to test the scope and boundaries of legal duties, remedies, and defenses, but the insurer should not be immune from liability under the UTPA simply because this Court had not yet explicitly rejected the legal proposition on which the insurer relied in the underlying action. This is precisely the point of evaluating the reasonableness of the insurer’s proffered defense.
¶116 Of course, if the law in 1995 had held that a conservator’s attorney does not owe a duty to the protected person, then ALPS’s no-duty defense would have been reasonable. Likewise, if the law in 1995 had not provided for the creation of a self-sufficiency trust, then Addy could not have been faulted for failing to establish one. As it is, however, ALPS could not rely on a definitive holding from this Court with respect to the duty owed by a conservator’s attorney to the protected person. Thus, ALPS was required to evaluate pertinent then-existing precedents and base its decision on those cases, mindful of any handwriting on the wall. The reasonableness of that evaluation, in turn, dictates whether ALPS proffered “a reasonable basis in law” for contesting Redies’ claims against Addy. As explained above, I conclude that ALPS’s evaluation of our then-existing precedents was not reasonable.
VI. Conclusion
¶117 ALPS’s assertion in the underlying action that Addy did not owe Redies a duty of care was not “a reasonable basis in law” on which to contest her third-party theory of liability. First, ALPS relied on the outdated “privity of contract” concept, which we had rejected in at least five cases over the 20-year period prior to 2001 and 2002, and which we had rejected with respect to attorneys, in particular, in 1998 in Rhode. ALPS was apprised of this fact in the evaluation it received a week before denying Redies’ claims. Specifically, ALPS was told:
As you know, however, there have been challenges in the past as to this privity requirement. Most of the erosion of the concept has occurred in connection with beneficiaries of wills being allowed to sue the attorney for the testator. To our knowledge, Montana has not decided the issue of whether a protected person might be able to sue the attorney of the conservator. Clearly, she could sue the conservator. Presumably, the conservator would have a right over *272 against his attorney. Thus, our court may short circuit that process by simply finding that the relationship between the protected person and the conservator’s attorney was close enough to allow suit.
We do not put a great deal of stock in this privity defense, but it represents yet another problem the Plaintiff is going to experience in prosecuting her claim. Given sufficient time and effort, we believe that defense can be circumvented. [Emphasis added.]
¶118 In the face of this advice, ALPS nevertheless chose to put Redies through the “time and effort” of circumventing its privity defense-which she ultimately did when Judge Baugh ruled, correctly, in the underlying action that “Mr. Addy owed a duty to Ms. Redies when he rendered legal advice to the conservator, Mr. Cosner.” ALPS’s actions were contrary to “the declared public policy of this State to encourage settlement and avoid unnecessary litigation,” Augustine v. Simonson, 283 Mont. 259, 266, 940 P.2d 116, 120 (1997) (citing Holmberg v. Strong, 272 Mont. 101, 106, 899 P.2d 1097, 1100 (1995)), and to the mandates of the Unfair Trade Practices Act, see, e.g., § 33-18-201(6), MCA (prohibiting insurers from “neglect[ing] to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear”).
¶119 Second, three approaches existed in our caselaw in 2001 and 2002 for determining whether a professional owes a duty of care to a third party in the performance of a contract. Unfortunately, in defending against Redies’ third-party theory of liability, ALPS relied on only one of these approaches-the Trask multi-factor balancing test. Furthermore, ALPS misapplied that test by ignoring three of the six factors and by making arguments (under the other three factors) that contradicted the actual facts of this case. As a result, ALPS reached the erroneous conclusion that Addy did not owe Redies a duty of care when he rendered legal advice to her conservator, Cosner. Had ALPS acknowledged that under our then-existing precedents, attorneys may be held liable to nonclients in certain situations (as it did), but then had merely cited the Trask test with no analysis whatsoever, I doubt that we would be reaching the result that the Court reaches today. I cannot fathom, then, how the Court can accept a patent misapplication of the Trask test as “a reasonable basis in law” for contesting Redies’ claims. ¶¶ 54-55.
¶120 Indeed, it contradicts the meaning of a “reasonable” basis in law defense to permit an insurer to proffer any argument-no matter how outlandish or lacking-as a basis for contesting the plaintiff s claim against its insured. To be sure, ALPS did not have to make the *273 prevailing, or even a highly persuasive, argument under the Trask test; but it did, at the very least, need to apply that test in a reasonable manner, mindful of our adoption of other approaches in Hawthorne, Tynes, Jim’s Excavating, Turner, and Thayer. Had it done so, it would have reached the correct conclusion that Addy owed Redies a duty of care. Instead, ALPS addressed only three of the six factors and, in that process, misstated the nature of the relationships at issue here and the purpose for which Addy had been retained by Cosner. I therefore do not agree with the Court that ALPS’s application of the Trask test satisfied § 33-18-242(5), MCA.
¶121 Because ALPS did not have “a reasonable basis in law” under § 33-18-242(5), MCA, for contesting Redies’ claims against Addy-not only because Redies, in actual fact, was Addy’s “client,” as argued in Justice Cotter’s Dissent, but also because Addy was liable under a third-party theory of liability-I conclude that ALPS was not entitled to judgment as a matter of law in the case at hand. I would reverse the District Court and remand this case for a trial on the merits of Redies’ claims against ALPS. I dissent from the Court’s contrary conclusion.
¶122 In closing, while I disagree with the Court’s decision in this case, I trust that, based on the analysis preceding the Court’s ultimate conclusion (and I agree with much of that analysis, as noted above), ALPS’s privity argument is finally put to rest and will not be resurrected by a legal malpractice insurer in some future UTPA case. It should be clear, henceforth, that the “privity of contract” defense will no longer provide an insurer with a reasonable basis in law for denying or contesting a third-party legal malpractice claim, and that the determinative question in such cases is whether the attorney placed himself or herself in such a relation toward the third party that the law will impose upon him or her a duty, sounding in tort, to act in such a way that the third party will not be injured.
¶123 I dissent.

 Notably, the first four Trask factors mirror the two primary considerations set forth in Prosser’s approach-namely, the nature of the relationship between the defendant and the third party (Did the defendant, by entering into a contract with A, place himself in such a relation toward B that that law will impose upon him an obligation to act in such a way that B will not be injured?), and the degree of certainty that the defendant’s conduct would affect the third partys interests (Did the defendant enter upon a course of affirmative conduct which may be expected to affect the interests of B?).