

DA 07-0155

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 285

THOMAS BECKER,

       Plaintiff and Appellant,

  v.

ROSEBUD OPERATING SERVICES, INC.

       Defendant and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 05-0717
Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Jeffrey A. Simkovic, Penelope S. Strong; Billings Legal, PLLC;
Billings, Montana

       For Appellee:

              Michael W. Tolstedt; Felt, Martin, Frazier & Jacobs, PC;
Billings, Montana

Submitted on Briefs:  January 8, 2008

Decided:  August 12, 2008

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Thomas Becker (Becker) was terminated from his employment as a fuel technician with Appellee Rosebud Operating Services, Inc. (ROSI), after a heated argument with his supervisor and the plant manager. Becker filed a wrongful discharge action against ROSI in the Thirteenth Judicial District Court, Yellowstone County. The District Court granted summary judgment to ROSI. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Should we decline to consider Becker's argument on appeal because his legal theory has changed from the theory previously argued and relied upon by the District Court?

¶4 2. Did the District Court err by granting ROSI's motion for summary judgment on Becker's wrongful discharge claim because material fact issues remain in dispute regarding whether good cause supported Becker's termination?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Becker was employed by ROSI as a "fuel tech" at its power plant in Colstrip, Montana, until his employment was terminated after a dispute with his employer on January 19, 2005. In September 2004, Becker had orally requested a lateral transfer from his current position as a fuel tech to a vacant "utility tech" position. Becker received a letter from ROSI plant manager Dan Gray (Gray) informing him that because his current hourly wage was substantially higher than the top wage for a utility tech, Becker would have to accept a pay decrease of approximately four dollars per hour if he took the vacant

utility tech position. Becker contacted the Montana Department of Labor and was informed that ROSI had the legal authority to decrease Becker's pay if he took the new position. On October 24, 2004, Becker wrote a letter to Gray withdrawing his transfer request. In his letter, Becker stated that the Department of Labor had advised him that "these kinds of issues are best handled under union representation." ROSI's employees were not unionized at that time. However, Becker contended in his complaint that he began to sense hostility from ROSI's management shortly after they received his letter.

¶6 On January 17, 2005, a limestone blower at ROSI malfunctioned. On January 19, 2005, Gray asked Becker's immediate supervisor and the plant's maintenance manager, Joe Kerzman (Kerzman), to walk Becker and the other fuel techs through the coal-handling system to ensure that it was being cleaned properly. Becker had heated exchanges with Kerzman in the plant control room and during the walk-through. Becker became agitated and angry because he felt he was being treated like an "idiot" and a "child" and was being blamed for the recent failure of the limestone blower. Due to Becker's argumentative and aggressive responses during the walk-through, Kerzman told Becker to accompany him to Gray's office.

¶7 Kerzman informed Gray that he was having disciplinary problems with Becker and, according to Becker, a three-way argument then ensued. During this argument, Becker told Kerzman to "kiss my ass," after which Gray and Becker engaged in a close shouting match. Becker repeatedly asked Gray if he was terminated, and Gray repeatedly responded that he was not terminating Becker, but that Becker was being placed on paid

3

administrative leave until he calmed down. According to Becker's initial version of the facts, Becker then called Gray a "prick," after which Gray fired him. According to ROSI's version, this sequence was accompanied by even more offensive language by Becker.

¶8 The only disputed fact appears to be the timing of Becker's cursing, and arises from inconsistencies in Becker's deposition testimony. Although Becker's complaint, deposition, and brief in opposition to summary judgment indicate that he swore at Gray *before* he was terminated, Becker also testified at the end of his deposition that he didn't say "kiss my ass" or call Gray a "prick" until *after* he was terminated. However, Becker now admits on appeal that he told Kerzman to "kiss my ass" before he was terminated, although he continues to maintain that he did not curse at Gray until after Gray terminated his employment.

¶9 After Gray told Becker he was fired, Becker allegedly kicked a chair in Gray's office and called Gray additional names as he stormed out of the office. Gray then called the Sheriff's Department to ensure the situation did not escalate further, and Becker left the premises after collecting his belongings.

¶10 Gray sent a letter to Becker advising him that he was terminated for "unruly behavior, threatening attitude and abusive language towards the Maintenance and Plant Managers." ROSI's employee handbook, which Becker acknowledged reading and signing, contained standards of conduct applicable to employees. The handbook listed non-inclusive examples considered to be serious breaches of conduct, including "[u]sing

4

profane or abusive language at any time on Company premises." The handbook provided that "[e]mployees who engage in behavior similar to the foregoing or that the Company considers unacceptable or inappropriate . . . will be subject to disciplinary action ranging from reprimand to immediate discharge, depending on the seriousness and/or frequency of the offense."

¶11 Becker filed a complaint alleging that ROSI's proffered reasons for terminating him "are not accurate, do not reflect a legitimate business reason, and are, therefore not good cause for terminating [Becker's] employment" under Montana's Wrongful Discharge from Employment Act (the "Act"). In Defendant's brief in support of summary judgment, ROSI argued that Montana law and ROSI's employee manual provided good cause for immediately terminating Becker's employment for cursing at ROSI management. ROSI's brief was supported by the affidavits of Gray and Kerzman, as well as affidavits of two ROSI employees who overheard the argument in Gray's office. In opposition, Becker argued that a material issue of disputed fact existed regarding "whether the events after the lateral transfer issue in October, 2004, and fear of Plaintiff promoting unionization in Rosebud, were real motivating factors in Defendant's conduct and are the real reasons for termination." Becker's brief was supported by his own deposition testimony, a discharge statement he filed with the Montana Unemployment Insurance Division, and a short email sent from Gray to others at ROSI after Becker had withdrawn his transfer request, informing them that Becker had

contacted the Department of Labor about possibly filing a complaint against ROSI due to the unfairness of having to take a pay cut if he transferred.

¶12 The District Court granted ROSI's motion for summary judgment, concluding that Becker presented no evidence, other than his own speculation, that he was discharged for anything other than good cause. According to the District Court, Becker failed "to bring before the Court evidence that Defendant's termination of the employment relationship involved his alleged union activities, or the alleged fears of the plant management that he would attempt to unionize the employees." Becker appeals.

### STANDARD OF REVIEW

¶13 We review a district court's grant or denial of summary judgment de novo. In doing so, we use the same criteria applied by the District Court under M. R. Civ. P. 56. "Summary judgment is an extreme remedy which should not be a substitute for a trial on the merits if a material factual controversy exists." *Delaware v. K-Decorators, Inc.*, 1999 MT 13, ¶ 55, 293 Mont. 97, ¶ 55, 973 P.2d 818, ¶ 55 (citations omitted). If the moving party can demonstrate no genuine issues of material fact exist and entitlement to judgment as a matter of law, the burden then shifts to the nonmoving party to prove, by more than mere denial and speculation, that a genuine issue does exist. *Bruner v. Yellowstone County*, 272 Mont. 261, 264, 900 P.2d 901, 903 (1995). "The party opposing the motion for summary judgment cannot rely on mere allegations in the pleadings, but must present its evidence raising genuine issues of material fact in the

6

form of affidavits or other sworn testimony." *Arnold v. Yellowstone Mountain Club, LLC*, 2004 MT 284, ¶ 14, 323 Mont. 295, ¶ 14, 100 P.3d 137, ¶ 14 (citation omitted).

## DISCUSSION

**¶14    1.  Should we decline to consider Becker's argument on appeal because his legal theory has changed from the theory argued to and relied upon by the District Court?**

¶15    In his brief in opposition to summary judgment, Becker's main argument was that a genuine issue of material fact existed regarding "whether the events after the lateral transfer issue in October, 2004, and fear of Plaintiff promoting unionization in Rosebud, were real motivating factors in Defendant's conduct and are the real reasons for termination." On appeal, Becker argues the genuine issue of material fact involves "facts underpinning the legal conclusion of good cause for termination."  More specifically, Becker argues there are material fact issues as to "the timing of any obscene words uttered by him," whether Becker or Gray was the aggressor, and whether Becker ever used the "F word."  Further, Becker's concluding argument is that even if he swore at his supervisors, "such is not good cause for his termination [because] he has a good work record and his termination was possibly tied to malfunctioning company equipment."

¶16    ROSI argues that Becker's complaint and brief in opposition to summary judgment focused on pretext, whereas Becker's current focus is on whether his use of profanity provided good cause for termination.  According to ROSI, this constitutes a change in legal theory that we should decline to consider on appeal.  Becker responds that his legal theory has always been that ROSI did not have good cause to terminate him

7

under § 39-2-904(1)(b), MCA, and that his argument regarding pretext is merely one aspect of his burden of proving the absence of good cause for his termination.

¶17 Our rule with regard to arguments presented for the first time on appeal is well established.

> The general rule in Montana is that this Court will not address either an issue raised for the first time on appeal or a party's change in legal theory. *Day v. Payne*, 280 Mont. 273, 276, 929 P.2d 864, 866 (1996) (citation omitted). The basis for the general rule is that "it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *Day*, 280 Mont. at 276-77, 929 P.2d at 866 (citation omitted).

*Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15.

¶18 While some specific arguments Becker offers on appeal were not offered in the District Court, we cannot conclude that Becker's overall theory or claim has significantly changed. In his complaint, Becker described his alleged union activities and his argument with Gray and Kerzman, and concluded with a general allegation that ROSI's proffered reasons for terminating Becker did not satisfy the Act's good cause requirement. Similarly, in his brief in opposition to summary judgment Becker alleged that "Defendant's feigned shock and offense at Plaintiff's foul language is simply not believable. Nor does it appear plausible that Plaintiff's use of foul language was really a disruption of Defendant's operation . . . ." While Becker's pretext theory was certainly the preeminent theory argued at the District Court, the focus of Becker's appellate briefing—specifically, the events and argument immediately leading up to his

8

termination—does not amount to such a significant change in legal theory that we must decline to consider his appeal. All of Becker's appellate arguments fall within the ambit of the Act's good cause requirement and were raised in Becker's complaint and brief in opposition to summary judgment.

¶19 **2. Did the District Court err by granting ROSI's motion for summary judgment on Becker's wrongful discharge claim because material fact issues remain in dispute regarding whether good cause supported Becker's termination?**

¶20 Becker's primary argument on appeal is that there is a genuine issue of material fact regarding *when* Gray told Becker he was discharged, and whether Becker used profanity towards Gray before or after Gray had terminated his employment. However, Becker's complaint, deposition testimony, and brief in opposition to summary judgment asserted that Becker directed profanity, first at Kerzman and then at Gray, *before* Gray told Becker he was fired. Becker apparently used profanity towards both men after he was placed on paid administrative leave to allow a cooling off period. In his complaint, Becker alleged:

> Plaintiff was led to Mr. Gray's office, where Mr. Kerzman continued to blame Plaintiff for the damaged blower. The managers closed the door to the office and Plaintiff began to feel intimidated and threatened, as both managers screamed at him. Mr. Gray told Plaintiff that he was "out of here." When Plaintiff responded, Mr. Kerzman jumped into the Plaintiff's face and told him to shut up. Plaintiff became outraged and cursed at [Kerzman] in order to get [him] away from his person. Then, Mr. Gray jumped in his face and Plaintiff cursed at him. Mr. Gray then told Plaintiff he was fired. . . .

Becker's deposition testimony further elaborated on this sequence of events:

> Q: So after Mr. Gray said something about leave, what happened after that?

9

A: I tried to ask him. I wanted him to clarify that.

Q: Did he?

A: He tried to.

Q: What did he say?

A: I don't recall because I had [Kerzman] barking at me.

Q: After you asked or [Gray] tried to clarify for you what he meant by leave but you couldn't hear him, is that what you're saying?

A: The argument just kept going. It just went back into the argument, and then from him I heard, "You're out of here."

Q: And during this, the latter part of this conversation or this argument, I should say, did you use any profanities?

A: After I was told I was out of here. Joe Kerzman told me to shut up.

Q: Okay.

A: I turned to him and told him to kiss my ass.

Q: And then what happened?

A: [Gray] jumped in my face.

Q: When you say he jumped in your face –

A: He jumped from his chair, jumped up, 'round the front side of his desk, came right up in front of me, and at that time I felt threatened.

Q: What did he say when he got in your face?

A: He said, "You're fired." First of all, no. He jumped in my face and I did call him a prick and then he said, "You're fired."

. . .

Q: When he got in your face. Did he say, "I want you to leave," or, "You're fired." No, I think you said he said, "You're fired," after you called him a prick.

A: Yes.

Becker made the same allegations in his brief in opposition to summary judgment, citing the aforementioned deposition testimony as his version of the facts.

¶21 The only alleged dispute in the facts arises from a contradictory statement Becker made at the end of his deposition, in which he stated he did not call Gray a prick until after he was terminated. It is this specific contention which Becker did not raise in his brief in opposition to summary judgment, but which Becker argues creates a genuine issue of material fact.

10

¶22 We have consistently held that, in opposing summary judgment, a party may not create genuine issues of material fact by contradicting his own sworn testimony. *Meadow Lake Estates Homeowners' Assoc. v. Shoemaker*, 2008 MT 41, ¶ 46, 341 Mont. 345, ¶ 46, 178 P.3d 81, ¶ 46; *Bowen v. McDonald*, 276 Mont. 193, 199, 915 P.2d 201, 205 (1996); *Stott v. Fox*, 246 Mont. 301, 309, 805 P.2d 1305, 1310 (1990). We have stated:

> "While the district courts must exercise extreme care not to take genuine issues of fact away from juries, '[a] party should not be allowed to create issues of credibility by contradicting his own earlier testimony' . . . Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplementing previous depositions ad hoc with a new affidavit, and no case would ever be appropriate for summary judgment."

*Stott*, 246 Mont. at 309, 805 P.2d at 1309-10 (quoting *Wilson v. Westinghouse*, 838 F.2d 286, 289 (8th Cir. 1988)).

¶23 Becker seeks to create a genuine issue of material fact based solely on his inconsistent testimony at the end of his deposition. The testimony is not only inconsistent with his testimony earlier in the deposition, but is also inconsistent with the version of facts Becker presented in his complaint and his brief in opposition to summary judgment. With the exception of Becker's back-pedaling at the end of his deposition, the sequence of statements made in Gray's office is consistent with ROSI's version and must be considered undisputed.

11

¶24 Because we have no choice but to conclude that Becker cursed at both Kerzman and Gray prior to being terminated, we next determine whether good cause supported Becker's termination. To prevail under the Act, an employee has the burden of proving his or her discharge was wrongful. *Delaware*, ¶ 57. Section 39-2-904, MCA, reads, in pertinent part:

> (1) A discharge is wrongful only if:
> (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;
> (b) *the discharge was not for good cause and the employee had completed the employer's probationary period of employment;* or
> (c) *the employer violated the express provisions of its own written personnel policy.*

(Emphasis added.) The Act defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." Section 39-2-903(5), MCA. A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Kestell v. Heritage Health Care Corp.*, 259 Mont. 518, 525, 858 P.2d 3, 7 (1993) (citation and internal quotation marks omitted). To defeat a motion for summary judgment on the issue of good cause, the employee may either prove that the given reason for the discharge is not "good cause" in and of itself, or that the given reason "is a pretext and not the honest reason for the discharge." *Johnson v. Costco Wholesale*, 2007 MT 43, ¶¶ 27-28, 334 Mont. 105, ¶¶ 27-28, 152 P.3d 727, ¶ 27-28 (quoting *Arnold*, ¶ 26). If the moving party presents no evidence that there is an issue of material fact relating to the

12

wrongful discharge claim, summary judgment is appropriate. *Arnold*, ¶ 26 (citation omitted).

¶25 Becker relies primary on our holdings in *Arnold* and in *Andrews v. Plum Creek Mfg.*, 2001 MT 94, 305 Mont. 194, 27 P.3d 426, in support of his argument that ROSI did not have good cause to terminate his employment. In *Arnold*, the plaintiff was a co-supervisor and cabin master of the housekeeping department at a private resort. In the weeks leading up to her termination, Arnold repeatedly requested guidance with regard to her job responsibilities, an evaluation of how she was performing, and a request for more structure within her job. *Arnold*, ¶ 7. When she was finally granted a meeting with her supervisors, Arnold was informed that she was being demoted from her supervisory position. *Arnold*, ¶ 8. She ended the meeting by saying "f--- this" as she walked out of the office. As she was exiting the resort, Arnold was informed by a security guard that she had been terminated. *Arnold*, ¶ 8.

¶26 After the District Court granted summary judgment to Arnold's employer, we reversed. Notably, Arnold had been demoted from her supervisory position despite prior representations that her job prospects were "excellent." *Arnold*, ¶ 6. It was clearly possible that the company had simply relied on Arnold's angry reaction to the demotion as justification for her immediate termination, and had no other basis for terminating Arnold's employment in light of her good performance. We concluded that the evidence raised a genuine issue of material fact whether Arnold's termination was justified under the employee handbook, and also raised a genuine issue of material fact whether Arnold's

termination was "merely a pretext to avoid facing her concerns and following the [company's] three-tiered disciplinary process." *Arnold*, ¶¶ 22, 27.

¶27 In *Andrews*, an office clerk at a plywood mill was told she was being removed from her office position after an audit revealed discrepancies in the office's record keeping. Andrews declined the opportunity to take another position in the mill and sued for wrongful discharge. She had been provided no supervision, no job evaluations, no written job standards and no accounting procedures while working in the office. *Andrews*, ¶ 16. She was also told there was no suggestion of impropriety on her part prior to the audit. *Andrews*, ¶ 9. Nonetheless, Andrews was removed from her office position based on a general allegation of poor performance of her duties. *Andrews*, ¶ 9. We concluded that the District Court erred by granting Andrews' employer summary judgment because Andrews presented sufficient evidence to create a genuine issue of material fact regarding her job performance. *Andrews*, ¶ 22.

¶28 The present case is distinguishable from *Andrews*, in which there was at minimum a question of fact about whether the plaintiff did anything wrong, and *Arnold*, in which a well-performing plaintiff was demoted after expressing a desire for more structure and supervision. It is here uncontested that Becker became defensive, agitated and angry during the walk-through with Kerzman and cursed at Kerzman and Gray after being notified that he was being placed on administrative leave. Becker continued escalating the situation after being placed on administrative leave, just as he had done with Kerzman prior to entering Gray's office. Becker told Kerzman to "kiss my ass" and called Gray a

14

"prick" after he had been placed on administrative leave. For purposes of determining good cause, the confrontational verbal assault and disruptive language Becker directed at his supervisors is clearly distinguishable from the frustrated comment Arnold made as she exited her employer's office.

¶29 ROSI's standards of conduct, set forth in the employee handbook, permitted "disciplinary action ranging from reprimand to immediate discharge, depending on the seriousness . . . of the offense." Serious breaches of conduct, including but not limited to "[u]sing profane or abusive language at any time on Company premises," were identified as potentially warranting immediate discharge. Becker was aware of ROSI's standards of conduct. Although Becker argues that foul language is commonplace at ROSI and was not that of "a ladies' tea party," directing profanity at one's supervisors after being told to calm down and leave the premises is much more egregious than simply using foul language throughout the course of an ordinary workday. Moreover, Becker presented no evidence that ROSI applied its employment policy unequally, arbitrarily or capriciously in this context which may give rise to a question concerning good cause. *See Johnson*, ¶ 27. The preliminary discipline of placing Becker on leave was certainly authorized under ROSI's policy and, in fact, constitutes further evidence that ROSI management was not engaged in a conspiracy to terminate Becker from the workforce altogether. However brief it may have been, Gray gave Becker an opportunity to go home and calm down, with pay. It was only after Becker further escalated the situation by directing profanity at Kerzman and Gray that he was terminated.

¶30 Becker's behavior was disruptive of ROSI's operation, and Becker presented no evidence that ROSI's reason for terminating him was "false, whimsical, arbitrary or capricious." Section 39-2-903(5), MCA; *Kestell*, 259 Mont. at 525, 858 P.2d at 7. Aside from conclusory and speculative statements to the District Court that he was terminated for his union activities, and that he was terminated because the limestone blower broke, Becker presented no evidence that the reason given for his termination was a pretext. *Arnold*, ¶ 26. The District Court correctly found there were no genuine issues of material fact and that good cause supported Becker's termination. Accordingly, ROSI was entitled to judgment as a matter of law.

¶31 Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS