FILED

May 10 2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0213

DA 15-0213

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 104

MONTANA IMMIGRANT JUSTICE ALLIANCE, MEA-MFT; and
ALISHA BLAIR,

        Plaintiffs and Appellees.

   v.

GOVERNOR STEVE BULLOCK, in his official capacity; ATTORNEY
GENERAL TIMOTHY C. FOX, in his official capacity; MONTANA BOARD
OF REGENTS OF HIGHER EDUCATION; COMMISSIONER OF HIGHER
EDUCATION CLAYTON CHRISTIAN; in his official capacity; and the
STATE OF MONTANA,

        Defendants and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
                    In and For the County of Lewis and Clark, Cause No. BDV 2012-1042
                    Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Timothy C. Fox, Montana Attorney General, Dale Schowengerdt, Solicitor
                General, Melissa Schlichting, Assistant Attorney General,
                Helena, Montana

        For Appellee:

                Brian Miller, Morrison, Sherwood, Wilson, and Deola, PLLP,
                Helena, Montana

                Shahid Haque-Hausrath, Border Crossing Law Firm, P.C.,
                Helena, Montana

      For Amicus ACLU of Montana Foundation:

                Mark L. Stermitz, Crowley Fleck PLLP, Missoula, Montana

                James Park Taylor, ACLU of Montana Foundation, Missoula, Montana

Submitted on Briefs:  March 16, 2016

Decided:  May 10, 2016

Filed:

_____
                        Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 In November 2012 the voters of Montana passed Legislative Referendum 121 (LR 121) by a wide margin. The referendum, codified at § 1-1-411, MCA, served to deny certain state services to individuals defined by the law to be "illegal aliens." Before the law went into effect, the Montana Immigrant Justice Alliance (MIJA) sought declaratory and injunctive relief from its provisions. The District Court granted MIJA's request in part, denied it in part, and awarded MIJA attorney fees. The State appeals both the District Court's order granting MIJA summary judgment and its order awarding MIJA attorney fees. We affirm in part and reverse in part.

## ISSUES

¶2 We address the following issues on appeal:

¶3 Did the District Court err in concluding that MIJA has standing to challenge LR 121?

¶4 Did the District Court err in concluding that LR 121 is preempted by federal law?

¶5 Did the District Court abuse its discretion by awarding attorney fees to MIJA?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 During the 2011 legislative session, the Montana legislature passed House Bill 638, an act denying certain state-funded services to people deemed "illegal aliens," and submitted the act to the voters of Montana as a legislative referendum. The referendum, LR 121, appeared on the November 6, 2012 ballot and was adopted by Montana voters by a wide margin. LR 121 was then codified at § 1-1-411, MCA, and went into effect on January 1, 2013. (For the sake of brevity, we generally refer to the law as "LR 121.")

¶7    The statute, entitled "Certain state services denied to illegal aliens," reads in its entirety:

(1) To the extent allowed by federal law and the Montana constitution and notwithstanding any other state law, a state agency may not provide a state service to an illegal alien and shall comply with the requirements of this section.

(2) To determine whether an applicant for a state service is an illegal alien, the agency may use the systematic alien verification for entitlements [SAVE] program provided by the United States department of homeland security or any other lawful method of making the determination.

(3) A state agency shall notify appropriate personnel in immigration and customs enforcement under the United States department of homeland security or its successor of any illegal alien applying for a state service.

(4) An agency shall require a person seeking a state service to provide proof of United States citizenship or legal alien status.

(5) A state agency shall execute any written agreement required by federal law to implement this section.

(6) As used in this section, the following definitions apply:

(a) "Agency" means a department, board, commission, committee, authority, or office of the legislative or executive branches of state government, including a unit of the Montana university system.

(b) "Illegal alien" means an individual who is not a citizen of the United States and who has unlawfully entered or remains unlawfully in the United States.

(c) "State service" means a payment of money, the grant of a state license or permit, or the provision of another valuable item or service under any of the following programs and provisions of law:

(i) employment with a state agency;

(ii) qualification as a student in the university system for the purposes of a public education, as provided in 20-25-502;

(iii) student financial assistance, as provided in Title 20, chapter 26;

(iv) issuance of a state license or permit to practice a trade or profession, as provided in Title 37;

(v) unemployment insurance benefits, as provided in Title 39, chapter 51;

(vi) vocational rehabilitation, as provided in Title 53, chapter 7;

(vii) services for victims of crime, as provided in Title 53, chapter 9;

(viii) services for the physically disabled, as provided in Title 53, chapter 19, parts 3 and 4;

(ix) a grant, as provided in Title 90.

Section 1-1-411, MCA.

¶8    The Montana Immigrant Justice Alliance is a Helena based non-profit organization dedicated to advancing the rights of immigrants in Montana. Among its members are Mexican citizens who entered the United States without being inspected by a customs or immigration official, but who have since obtained lawful permanent residence status. Immigrants in this situation fear that LR 121's definition of "illegal alien" includes them because they entered the United States unlawfully, and that accordingly they will be deprived of state services even though they now are considered documented, lawful immigrants by the Department of Homeland Security.

¶9    Motivated in part by this fear, MIJA filed a complaint in District Court on December 7, 2012, seeking declaratory and injunctive relief from LR 121. The labor association, MEA-MFT, and a 22 year old Montana resident named Alisha Blair joined MIJA as plaintiffs. The complaint named as defendants various government officials tasked with enforcing provisions of LR 121, including the Governor, the Attorney General, and the Commissioner of Higher Education, as well as the Board of Regents of Higher Education and the State of Montana (collectively the State).

¶10    In support of their request for a preliminary injunction, the plaintiffs argued they were entitled to injunctive relief because the referendum violated certain constitutional rights and was preempted by federal law. The District Court denied the plaintiffs' request for a preliminary injunction as to the majority of LR 121, but enjoined the use of the definition of "illegal alien" in section 1(6)(b) (codified at § 1-1-411(6)(b), MCA) so as to preclude the State from using an individual's unlawful entry into the United States as a factor in determining that individual's entitlement to state benefits. The District

5

Court also issued a limiting construction to Section 1(2) of LR 121 (codified at § 1-1-411(2), MCA) so that when determining who is entitled to benefits, the State may not rely solely on the SAVE program but "will further use other lawful methods of making a determination based on federal resources."

¶11 The State then filed a motion to dismiss the case for lack of standing, arguing that any alleged injury to plaintiffs caused by LR 121 was abstract and speculative because the law had not been enforced against anyone to date. The District Court agreed that MEA-MFT and Alisha Blair did not have standing and granted the State's motion as to those two plaintiffs. However, the District Court denied the State's motion to dismiss MIJA for lack of standing, finding MIJA's members' "fear of trouble from LR 121 is reasonable" and that declining to review LR 121 would "immunize the referendum from review."

¶12 In the spring of 2014, the parties filed cross motions for summary judgment and assured the District Court that no factual issues prevented a ruling on the motions. MIJA moved for summary judgment on the issue of federal preemption. The State moved for summary judgment on MIJA's constitutional claims as well as the preemption claim. Following full briefing and a hearing on the motions, the District Court found that LR 121 was preempted in its entirety, with one exception, and granted MIJA's motion for summary judgment as to all but section 1(3) of LR 121 (codified at § 1-1-411(3), MCA), which requires the State to notify the US Department of Homeland Security of any illegal alien applying for a state service. The District Court simultaneously denied the State's motion for summary judgment, except as to section 1(3).

6

¶13    After the District Court found that LR 121 was preempted by federal law, MIJA filed a motion for attorney fees.  The District Court denied the motion.  However, four days after the District Court denied MIJA's motion for attorney fees, this Court decided the case of *City of Helena v. Svee*, 2014 MT 311, 377 Mont. 158, 339 P.3d 32.  MIJA then filed a motion to amend the District Court's earlier ruling denying attorney fees, arguing that this Court's ruling in *Svee* constituted a notable change in the law concerning the award of attorney fees in declaratory judgment actions.  The District Court agreed with MIJA's interpretation of *Svee*, vacated its November 21, 2014 order denying fees, and awarded MIJA attorney fees.  The State now appeals the District Court's June 20, 2014 order on cross motions for summary judgment and the order awarding attorney fees.

**STANDARD OF REVIEW**

¶14    We review a district court's entry of summary judgment de novo.  *McClue v. Safeco Ins. Co.*, 2015 MT 222, ¶ 8, 380 Mont. 204, 354 P.3d 604 (citing *Albert v. City of Billings*, 2012 MT 159, ¶ 15, 365 Mont. 454, 282 P.3d 704).  "Summary judgment is appropriate when the moving party demonstrates both the absence of any genuine issues of material fact and entitlement to judgment as a matter of law."  *Albert*, ¶ 15 (citing M. R. Civ. P. 56).  If there is no dispute of material fact, we review whether the district court correctly applied the law.  *Svee*, ¶ 7 (citing *Kalispell Educ. Ass'n v. Bd. of Trustees*, 2011 MT 154, ¶ 9, 361 Mont. 115, 255 P.3d 199).  A district court's determinations regarding standing and federal preemption are questions of law which we review for correctness.  *Aspen Trails Ranch, LLC v. Simmons*, 2010 MT 79, ¶ 30, 356 Mont. 41, 230 P.3d 808; *see e.g. Fenno v. Mountain West Bank*, 2008 MT 267, 345 Mont. 161, 192 P.3d 224.

7

¶15 "This Court reviews for correctness a district court's conclusion regarding the existence of legal authority to award attorney fees." *Svee*, ¶ 7 (citing *Hughes v. Ahlgren*, 2011 MT 189, ¶ 10, 361 Mont. 319, 258 P.3d 439). If legal authority exists, we review a district court's order granting or denying attorney fees for abuse of discretion. *Svee*, ¶ 7 (citing *Hughes*, ¶ 10).

## DISCUSSION

¶16 *Did the District Court err in concluding that MIJA has standing to challenge LR 121?*

¶17 As noted above, the District Court issued a limited preliminary injunction concerning section 1(6)(b) of LR 121 (codified at § 1-1-411(6)(b), MCA) so that it reads as follows: (b) "Illegal alien" means an individual who is not a citizen of the United States and ~~who has unlawfully entered or~~ remains unlawfully in the United States." Following the District Court's injunction, the State filed a notice of stipulation in which it informed the court that the State "will not use an individual's unlawful entry into the country as a factor in determining whether that person is eligible for benefits." The State then couched its stipulation as a "disavowal" of that part of the law and used its disavowal to argue that MIJA no longer had standing to challenge LR 121 because there was no longer a credible threat of enforcement. The District Court determined that the State's disavowal was insufficient to deprive MIJA of standing. We agree.

¶18 The judicial power of Montana's courts is limited to "justiciable controversies." *Reichert v. State*, 2012 MT 111, ¶ 53, 365 Mont. 92, 278 P.3d 455. This limitation derives from the "cases at law and in equity" language of Article VII, Section 4(1) of the

8

Montana Constitution, which "embodies the same limitations as are imposed on federal courts by the 'case or controversy' language of Article III" of the United States Constitution. *Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 567. Among the central components of justiciability are the doctrines of standing and ripeness. *Reichert*, ¶ 54.

¶19 "The question of standing addresses whether a litigant is entitled to have the court decide the merits of a particular dispute." *Chipman v. Northwest Healthcare Corp.*, 2012 MT 242, ¶ 25, 366 Mont. 450, 288 P.3d 193. In order to have standing, "the complaining party must clearly allege past, present or threatened injury to a property or civil right, and the alleged injury must be one that would be alleviated by successfully maintaining the action." *Chipman*, ¶ 26. Although we generally prohibit a litigant from vindicating the legal rights of a third party,

> [i]t is well established that an association has standing to bring suit on behalf of its members, even without a showing of injury to the association itself, when (a) at least one of its members would have standing to sue in his or her own right, (b) the interests the association seeks to protect are germane to its purpose, and (c) neither the claim asserted nor the relief requested requires the individual participation of each allegedly injured party in the lawsuit.

*Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 43, 360 Mont. 207, 255 P.3d 80. In this case, MIJA is claiming associational standing.[1]

---

[1] MIJA argued for the first time on appeal that in addition to associational standing, it also has standing in its own right to challenge LR 121 because the law threatens to divert MIJA's resources and frustrate its mission. However, it is well established that we will not address an issue raised for the first time on appeal, nor will we address a party's change in legal theory. *Becker v. Rosebud Operating Servs.*, 2008 MT 285, ¶ 17, 345 Mont. 368, 191 P.3d 435. Accordingly, we decline to address MIJA's argument that it has direct, as opposed to associational, standing.

¶20    Ripeness can be viewed as one of "the time dimensions of standing" because it is called into question when a party is complaining of a threat of future injury. *Reichert*, ¶ 55 (quoting Charles Alan Wright et al., *Federal Practice and Procedure* vol. 13B, § 3531.12, 163 (3d ed. West 2008)). "Ripeness asks whether an injury that has not yet happened is sufficiently likely to happen or, instead, is too contingent or remote to support present adjudication." *Reichert*, ¶ 55. "Ripeness is predicated on the central perception that courts should not render decisions absent a genuine need to resolve a real dispute; hence, cases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." *Reichert*, ¶ 54. In this case, the State has challenged both MIJA's associational standing and the ripeness of MIJA's claims.

¶21    MIJA easily satisfies the second and third requirements of associational standing. MIJA's mission statement declares that the organization seeks "[t]o combat the mistreatment of immigrants from xenophobia, discrimination, harassment, or racial profiling[,] . . . to promote policies that welcome and support the growth of immigrant communities in our state, and to combat policies that marginalize migrant communities." LR 121 was enacted to deter "illegal aliens" from coming to Montana and to prevent them from accessing state services if they do come. Because the interests MIJA is seeking to protect by challenging the constitutionality of LR 121 are germane to its purpose, MIJA satisfies the second requirement of associational standing. *Heffernan*, ¶ 43. Additionally, "a request for declaratory and injunctive relief does not require participation by individual association members," so MIJA satisfies the third requirement

for associational standing. *Heffernan*, ¶ 46. MIJA has associational standing then if "at least one of its members would have standing to sue in his or her own right." *Heffernan*, ¶ 43.

¶22 MIJA's members claim standing to challenge LR 121 based on a threat of future injury. This is the intersection of the doctrines of standing and ripeness: MIJA's members must show their claims are sufficiently ripe to afford them standing to challenge the law before it is enforced against them. MIJA submitted affidavits from multiple immigrants who arrived in the United States unlawfully but who have since obtained lawful immigration status. LR 121's definition of "illegal alien"—"an individual who is not a citizen of the United States and who has unlawfully entered or remains unlawfully in the United States," § 1-1-411(6)(b), MCA—clearly encompasses these individuals. Thus, by its own terms, LR 121 would deprive the affiants of state services even though they currently have lawful immigration status. The State maintains that its disavowal of the definition of "illegal alien" renders the threat of enforcement against these affiants sufficiently "hypothetical, speculative, or illusory" to make their claims unripe, thereby depriving the affiants of standing. *Reichert*, ¶ 54.

¶23 MIJA points to *Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997), as an example of a case in which this Court determined plaintiffs had standing to challenge a law before the law was enforced against them. In *Gryczan*, we were asked to review Montana's statute criminalizing consensual sexual relations between adults of the same gender. The challenge to the statute was brought by three men and three women who were homosexuals and who had engaged in conduct that violated the statute. *Gryczan*,

11

283 Mont. at 439, 942 P.2d at 115-16. At the time the case was brought, the statute was 24 years old and had been amended as recently as six years prior, but it had never been enforced and no one had ever been prosecuted under it for engaging in consensual homosexual sexual conduct. *Gryczan*, 283 Mont. at 443, 942 P.2d at 118. The plaintiffs brought a declaratory judgment action, claiming that although they had never been arrested or prosecuted under the statute, they had been injured by its existence because the statute damaged their self-esteem and dignity and made them fearful that they would be prosecuted, they would lose their livelihood, and they would lose custody of their children. *Gryczan*, 283 Mont. at 441, 942 P.2d at 117. The State maintained that mere apprehension of prosecution was insufficient to confer standing because "there is no evidence of a credible threat of prosecution under the statute." *Gryczan*, 283 Mont. at 441, 942 P.2d at 117. We agreed with the plaintiffs and held that

> [b]ecause the legislature does not regard the statute as moribund and because enforcement has not been foresworn by the Attorney General, we agree that Respondents suffer a legitimate and realistic fear of criminal prosecution along with other psychological harms. Respondents are precisely the individuals against whom the statute is intended to operate. This is sufficient to give Respondents standing to challenge the constitutionality of the statute. Moreover, to deny Respondents standing would effectively immunize the statute from constitutional review.

*Gryczan*, 283 Mont. at 446, 942 P.2d at 120.

¶24 The State in this case distinguishes our holding in *Gryczan* from the case at bar by highlighting the fact that the Attorney General in this case has "foresworn" enforcement of LR 121's definition of "illegal alien." The State would have us deny MIJA standing because the current Attorney General has "disavowed" one part of the law. However, we

12

noted in *Gryczan* that "there is nothing to prevent a county attorney from enforcing the statute against consenting adults," and the same concern operates here. *Gryczan*, 283 Mont. at 444, 942 P.2d at 119. A new Attorney General would not be bound by the present Attorney General's decision not to enforce the challenged definition, nor would the present Attorney General be legally bound by his earlier promise not to enforce the definition.[2] Moreover, LR 121 prohibits a state agency from providing a state service to an "illegal alien." The statute defines "agency" as "a department, board, commission, committee, authority, or office of the legislative or executive branches of state government, including a unit of the Montana university system." Section 1-1-411(6)(a), MCA. Thus, the number of government officials to whom enforcement of LR 121 might fall vastly exceeds the number of officials who could have enforced the deviate sexual conduct statute at issue in *Gryczan*, rendering the Attorney General's disavowal of the definition of "illegal alien" of even less consequence here than would have been the case in *Gryczan*.

¶25 Furthermore, "disavowal" does not address the other concerns raised in *Gryczan* and raised here. The legislature certainly does not consider LR 121 moribund, as it was submitted to the voters in 2012. MIJA's members suffer a legitimate and realistic fear

---

[2] Attorney General Opinions are binding on state-employed attorneys, but they are not binding on District Courts or the Supreme Court. Section 2-15-501(7), MCA; *O'Shaughnessy v. Wolfe*, 212 Mont. 12, 17, 685 P.2d 361, 364 (1984). "Courts never look to administrative interpretation when the language [of a statute] is clear beyond cavil. To hold otherwise would be to say that administrators and executive officials, interpreting the effect of statutes, could undermine the enactments by official action and nullify otherwise validly adopted laws." *O'Shaughnessy*, 212 Mont. at 17, 685 P.2d at 364. In this case, the Attorney General's "disavowal" of the definition of "illegal alien" is not even set forth in an official Attorney General Opinion and is thus of no precedential value.

that LR 121's definition of "illegal alien" will be interpreted by many state officials to include them, which would render them ineligible for state services for which they would otherwise be eligible. The MIJA members who came to the United States unlawfully and settled in Montana are precisely the individuals against whom the law is intended to operate, and denying them standing to challenge LR 121 would effectively immunize the statute from constitutional review. In fact, if the State's disavowal was enough to deprive MIJA of standing in this case, the invocation of disavowal—which has no basis in Montana law[3] and is at odds with the executive branch's constitutional duty to "see that the laws are faithfully executed," Mont. Const. art. VI, § 4(1)—would enable the State in any case to negate a claim of standing premised on the threat of future injury. Our constitution "protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480, 130 S. Ct. 1577, 1591 (2010). Like the US Supreme Court, we will "not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Stevens*, 559 U.S. at 480, 130 S. Ct. at 1591.

---

[3] The State's use of the term "disavowal" seems to come from our use of the term in *Gryczan*, when we said "at least one circuit court has held that nothing short of an express unconditional statement that the law will not be enforced will bar plaintiffs from challenging a law. Here, the State has made no such disavowal." *Gryczan*, 283 Mont. at 445, 942 P.2d at 119-20 (internal citation omitted). However, in the Eight Circuit case we referenced in *Gryczan*, the court went on to say that "[p]ast arrests or threats of arrest, while relevant, are not necessary to establish the justiciability of plaintiffs' claim . . . . Where plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest which is clearly proscribed by statute, courts have found standing to challenge the statute, even absent a specific threat of enforcement." *United Food & Commercial Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 427-28 (8th Cir. 1988). The justiciability of a pre-enforcement challenge necessarily depends on the facts of the particular case and the language of the statute in question. Contrary to the State's interpretation, our phrasing in *Gryczan* did not establish a bright line test for justiciability.

¶26 The affiants in this case have shown that if the definition of "illegal alien" is enforced, they would be ineligible for unemployment insurance benefits if they lost their jobs; they would be ineligible for victim services if they were the victims of crime; they would be ineligible to become students in a state university or to receive financial aid in pursuit of higher education; they would be ineligible for vocational rehabilitation, services for the disabled, or employment with a state agency; and they would not be allowed to obtain a license to practice a trade or profession. The State's assurance that LR 121 will not be enforced against them under the current administration is insufficient to render MIJA's claims "hypothetical, speculative, or illusory." *Reichert*, ¶ 54. MIJA's claims are ripe and its members would have standing to sue in their own right, even before the challenged provision is enforced. This holding comports with the purpose of the Uniform Declaratory Judgment Act, which "is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." Section 27-8-102, MCA. Thus, the District Court did not err in holding that MIJA has associational standing to bring this case.

¶27 *Did the District Court err in concluding that LR 121 is preempted by federal law?*

¶28 The Supremacy Clause of the US Constitution provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The Supremacy Clause endows Congress with the power to preempt

15

state law. *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012). Congress may preempt state law in three ways, generally referred to as express preemption, field preemption, and conflict preemption, the latter two being forms of implied preemption. *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022-23 (9th Cir. 2013).

¶29 Express preemption occurs when Congress enacts a statute that contains an express preemption provision. *Arizona*, 132 S. Ct. at 2500-01. Field preemption occurs when "the States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 132 S. Ct. at 2501. This determination is evident where there is "a framework of regulation so pervasive . . . that Congress left no room for the States to supplement it or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 132 S. Ct. at 2501 (internal quotations omitted). Conflict preemption occurs when a state law conflicts with a federal law, including cases in which "compliance with both federal and state regulations is a physical impossibility," and cases in which "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 132 S. Ct. at 2501 (internal quotations omitted).

¶30 The federal government has "broad, undoubted power over the subject of immigration and the status of aliens," stemming in part from its constitutional power to "establish an uniform Rule of Naturalization," and in part from its "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona*, 132 S. Ct. at 2498 (citing U.S. Const. art. I, § 8, cl. 4). Because the "[p]ower to regulate immigration

16

is unquestionably exclusively a federal power," a state law is field preempted if it attempts a regulation of immigration. *De Canas v. Bica*, 424 U.S. 351, 354, 96 S. Ct. 933, 936 (1976). A regulation of immigration is "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain," but not "every state enactment which in any way deals with aliens is a regulation of immigration and thus *per se* pre-empted by this constitutional power." *De Canas*, 424 U.S. at 355, 96 S. Ct. at 936. Although in many areas state laws are entitled to a presumption of non-preemption, when a state law attempts to regulate an area of significant and historical federal concern, like immigration, the state law is entitled to no such presumption. *Valle Del Sol Inc.*, 732 F.3d at 1023.

## A. Express preemption

¶31 Some federal immigration statutes contain express preemption clauses, but many do not. *Compare* 8 U.S.C. § 1324a(h)(2), *with* 8 U.S.C. § 1621. As noted, LR 121 is entitled "Certain state services denied to illegal aliens." The federal statutes governing alien eligibility for state or local public benefits do not contain an express preemption clause. 8 U.S.C. §§ 1621, 1622. Because Congress is capable of expressly declaring its intent to preempt state law, *see e.g.* 8 U.S.C. § 1324a(h)(2) ("The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."), the fact that it has not done so in the statutes regarding aliens' eligibility for public benefits leads us to conclude that state laws in this realm are not expressly preempted.

**B. Implied preemption**

¶32    In this case, MIJA contends that LR 121 attempts a regulation of immigration and is both field and conflict preempted.[4]  The District Court agreed, finding both field and conflict preemption arising out of LR 121's definition of "illegal alien" and LR 121's empowerment of state officials to determine whether an immigrant is lawfully present. The State asserts that LR 121 is not field preempted as a regulation of immigration because it does not "purport[] to determine who can and cannot remain in the country." The State also maintains that LR 121 does not conflict with federal law because "federal law either requires or expressly allows what LR 121 does."  In support of its position, the State notes that federal law occasionally uses the term "illegal alien."  *See e.g.* 8 U.S.C. § 1621(d); *De Canas*, 424 U.S. at 353, 96 S. Ct. at 935.  It also notes that 8 U.S.C. § 1621 provides that aliens who are not "qualified aliens" are "not eligible for any State or local public benefit."   But the federal statute's use of the defined term "qualified alien" underscores one of the essential problems with LR 121: it utilizes the term "illegal alien," which is not a defined term in federal immigration law. This essentially leaves the decision about who qualifies as an "illegal alien" up to multiple state officials, and the definition's applicability to various provisions of LR 121 creates eligibility determinations that are at odds with federal laws on the same subjects.

---

[4]  There is some debate in the briefing about whether MIJA has brought a facial challenge or an as applied challenge.  Because we are deciding this case on preemption grounds, the distinction is of no consequence.  *Green Mt. R.R. Corp. v. Vermont*, 404 F.3d 638, 644 (2d Cir. 2005).

### 1. Field Preemption

¶33　LR 121's definition of "illegal alien" attempts a regulation of immigration by creating an immigration status that does not exist under federal law. Federal law uses many defined terms for various purposes, including "qualified alien," 8 U.S.C. § 1641(b), "unauthorized alien," 8 U.S.C. § 1324a(h)(3), and "eligible noncitizen," 34 C.F.R. § 668.131, but it does not define the term "illegal alien," and it does not have a comprehensive definition of "lawfully present," *Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (citing 8 U.S.C. § 1101) ("The Immigration and Nationality Act does not provide a statutory definition for 'lawful immigration status.'"). These federally defined terms may encompass individuals who entered the country unlawfully but who have since been granted lawful immigration status pursuant to the discretion of federal officials. *See e.g.* 8 U.S.C. § 1229b. The State acknowledged that LR 121's "definition of 'illegal alien' may be imperfect because it could be read to apply to those who entered the country unlawfully, but now have legal immigration status," but the State maintains "that is not a defect of constitutional proportions." We disagree.

¶34　The federal government occupies the field of classifying non-citizens for various purposes. As the Supreme Court stated, "[t]he central concern of the [Immigration and Nationality Act] is with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *De Canas*, 424 U.S. at 359, 96 S. Ct. at 938. For this reason, "[t]he States enjoy no power with respect to the classification of aliens." *Plyler v. Doe*, 457 U.S. 202, 225, 102 S. Ct. 2382, 2399 (1982). Many cooperative state and federal programs require state agencies to verify an applicant's

immigration status, but "state agents perform a ministerial rather than a discretionary function in verifying immigration status. That is, state agents merely access INS information to verify an applicant's immigration status—no independent determinations are made and no state-created criteria are applied." *League of United Latin Am. Citizens v. Wilson*, 908 F. Supp. 755, 770 (C.D. Cal. 1995). There is an essential difference between a state agency performing a ministerial function and a state agency performing a discretionary function:

> Permitting state agents, who are untrained—and unauthorized—under federal law to make immigration status decisions, incurs the risk that inconsistent and inaccurate judgments will be made. On the other hand, requiring state agents simply to verify a person's status with the INS involves no independent judgment on the part of state officials and ensures uniform results consistent with federal determinations of immigration status.

*League of United Latin Am. Citizens*, 908 F. Supp. at 770.

¶35 When a state law authorizes a state official to perform what is essentially a discretionary function with regard to immigration, courts have found that law to be preempted as an impermissible regulation of immigration. The Third Circuit held that certain Pennsylvania housing ordinances preventing "unauthorized aliens" from renting housing "constitute an impermissible regulation of immigration and are field pre-empted because they intrude on the regulation of residency and presence of aliens in the United States." *Lozano v. City of Hazleton*, 724 F.3d 297, 317 (3d Cir. 2013). The Fifth Circuit held "that because the power to classify non-citizens is reserved exclusively to the federal government," a section of a Texas ordinance that allows state officials to assess whether a noncitizen is "lawfully present" is preempted by federal law. *Villas at Parkside Partners*

20

*v. City of Farmers Branch, Texas*, 726 F.3d 524, 536-37 (5th Cir. 2013). The Eleventh

Circuit held that an Alabama law prohibiting courts from enforcing contracts to which

"unlawfully present" aliens are parties "constitutes a thinly veiled attempt to regulate

immigration under the guise of contract law" and is thus preempted. *United States v.*

*Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012).

¶36    Citing the Third, Fifth, and Eleventh Circuits' rulings, the Ninth Circuit recently

reviewed an Arizona law that required applicants for a driver's license to submit proof of

"authorized presence" in the United States. *Ariz. Dream Act Coalition v. Brewer*, 2016

U.S. App. LEXIS 6256, \*\*27-29 (9th Cir. 2016). The Ninth Circuit held that

> Arizona's policy of denying drivers' licenses to DACA recipients based on
> its own notion of "authorized presence" is preempted by the exclusive
> authority of the federal government under the INA to classify noncitizens,
> [. . .] not because it denies state benefits to aliens, but because the
> classification it uses to determine which aliens receive benefits does not
> mirror federal law.

*Ariz. Dream Act Coalition*, 2016 U.S. App. LEXIS 6256 at \*\*34-35. For the same

reason, we now hold that LR 121 attempts a regulation of immigration and is preempted

by federal law, not because it denies state benefits to "illegal aliens," but because the

term "illegal aliens" is unknown to federal law, thus placing in the hands of state agents

immigration status decisions not authorized under federal law.

¶37    Furthermore, LR 121's mechanism for determining whether an applicant for state

services is an "illegal alien" is in effect an attempt to regulate immigration, and is also

field preempted by federal law. LR 121 requires that "[t]o determine whether an

applicant for a state service is an illegal alien, the agency may use the systematic alien

verification for entitlements [SAVE] program provided by the United States department of homeland security or any other lawful method of making the determination." Section 1-1-411(2), MCA. The State has failed to point to any federal resource or database apart from SAVE that can be used in a benefit eligibility inquiry, so we concern ourselves only with the SAVE program.

¶38 The limitations of the SAVE program have been addressed by courts before. In a case similar to the one at bar, the Fifth Circuit was asked to determine whether a city ordinance requiring a license to occupy a rented apartment was preempted by federal law. *Villas*, 726 F.3d at 526. Under the terms of the ordinance, in order to obtain a license to rent, an individual had to be "lawfully present" in the United States. The determination of who was "lawfully present" was to be made by querying the SAVE database. *Villas*, 726 F.3d at 533. "[T]he chief of that program testified that SAVE can provide only a non-citizen's specific immigration status; it does not answer lawful presence or not." *Villas*, 726 F.3d at 533 (internal quotations omitted). In other words, SAVE will tell a state official that a certain alien entered the United States on an F-1 visa, a K-1 visa, a green card, etc., but SAVE cannot tell a state official whether the alien originally entered the United States unlawfully or whether that alien remains unlawfully. Under LR 121, the information about lawful entry and presence is required for a state official to make a determination about whether an applicant for state services is an "illegal alien," but that determination cannot be made solely by querying the SAVE database. As a result, the determination must be made by the state official.

22

¶39 During discovery, MIJA deposed various state officials to elicit precisely how the state officials intended to determine whether an applicant is an "illegal alien." When asked how a state agency would determine if someone "unlawfully remains" in the United States, none of the deponents representing administrative agencies could identify how the determination would be made. This "incurs the risk that inconsistent and inaccurate judgments will be made," *League of United Latin Am. Citizens*, 908 F. Supp. at 770, and is one of the many reasons determinations about lawful presence are to be made solely by qualified federal agents, *see Arizona*, 132 S. Ct. at 2502. The risk of inconsistent and inaccurate judgments is further multiplied by LR 121's authorizing state agents to make immigration status determinations using the SAVE program "or any other lawful method of making the determination." Section 1-1-411(2), MCA. The "any other lawful method" language invites state agents to embark on an expedition through immigration laws and regulations without the benefit of guidance from qualified federal agents. The risk of inconsistent and inaccurate judgments issuing from a multitude of state agents untrained in immigration law and unconstrained by any articulated standards is evident.

¶40 As the Supreme Court said in *Arizona v. United States*, "[w]here Congress occupies an entire field, . . . even complementary state regulation is impermissible. Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." 132 S. Ct. at 2502. Thus the fact that LR 121 attempts to limit its own interpretation to "the extent allowed by federal law," § 1-1-411(1), MCA, is insufficient to save it from preemption because Congress has

occupied the particular field LR 121 attempts to regulate. The District Court did not err in finding that LR 121 was field preempted by federal law.

### 2. Conflict preemption

¶41 LR 121 is also conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 132 S. Ct. at 2501 (internal quotations omitted). LR 121's definition of "illegal alien" disqualifies for state services certain aliens who would otherwise be qualified for those services under federal law.

¶42 For example, "employment with a state agency" is one of the state services to which "illegal aliens" are not entitled under LR 121. Section 1-1-411(6)(c)(i), MCA. But employment of aliens is regulated by federal law and is to be decided by the definition of "unauthorized alien." 8 U.S.C. § 1324a(a)(1)(a). An "unauthorized alien" is one who is not "(A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or by the Attorney General." 8 U.S.C. § 1324a(h)(3). As discussed above, there are many circumstances in which an alien originally enters the country unlawfully but is later admitted for permanent residence. In fact, many MIJA members who submitted affidavits in this case are in precisely this situation. Under federal law, they are not "unauthorized aliens," and thus they would be eligible for employment with a state agency, but for LR 121's expansive definition of "illegal alien." This is a clear conflict with federal law.

¶43 Another example is LR 121's disqualification of "illegal aliens" from attendance at a state university. Section 1-1-411(6)(c)(ii), MCA. Eligibility for federal public

benefits, including attendance at a public university, is regulated by federal law and is to be decided by the definition of "qualified alien." 8 U.S.C. § 1611(c)(1)(B). A "qualified alien" includes aliens who are lawfully admitted for permanent residence under the INA, aliens who are granted asylum or refugee status under the INA, aliens whose deportation is being withheld under the INA, aliens who have been granted conditional entry under the INA, and several other classifications of aliens. 8 U.S.C. § 1641(b). This definition also encompasses individuals, like many of the MIJA affiants, who may have entered the country unlawfully but who now have lawful immigration status. Under federal law, the MIJA members who are permanent residents are "qualified aliens" for purposes of postsecondary education, and thus they would be eligible to attend a Montana university, but for LR 121's expansive definition of "illegal alien." This too is a clear conflict with federal law.

¶44    There are many other instances in which LR 121's definition of "illegal alien" conflicts with federal law's classification of various immigrants. LR 121 is therefore an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 132 S. Ct. at 2501 (internal quotations omitted). The District Court did not err in concluding that LR 121 is conflict preempted by federal law.

¶45    Finally, we turn to the provision of LR 121 that was saved from preemption by the District Court. LR 121 contains a severability clause. H.B. 638, 62d Leg., Reg. Sess. (Mont. 2011). The District Court determined that LR 121's mandatory reporting requirement was not preempted by federal law because "the federal government encourages this sort of notification," *see e.g.* 8 U.S.C. § 1373(a); 8 U.S.C. § 1644, and the

25

notification could be effectuated independently of the preempted portions of the law. The District Court severed the reporting requirement, codified at § 1-1-411(3), MCA, from the remainder of LR 121 and sustained it, pursuant to the "well-established principle that a statute is not destroyed in toto because of an improper provision." *Reichart*, ¶ 86. However, the mandatory reporting requirement, like the other improper provisions of LR 121, uses the term "illegal alien": "[a] state agency shall notify appropriate personnel in immigration and customs enforcement under the United States department of homeland security or its successor of any illegal alien applying for a state service." Section 1-1-411(3), MCA. A state official would not be able to carry out his or her reporting duty without first determining whether the person applying for a state service is an "illegal alien." This raises all the problems discussed above. Because the reporting requirement is also dependent upon LR 121's definition of "illegal alien," we hold that it cannot be severed from the rest of the law; it too is preempted.[5]

¶46　LR 121 was intended to force "illegal aliens . . . to leave Montana rather than use our services and take our jobs." The definition of "illegal alien" is an essential part of the law; indeed, the law would serve no purpose if the definition of "illegal alien" were removed. Because the entirety of § 1-1-411, MCA, is infected with a definition of "illegal alien" that is unconstitutional under the Supremacy Clause, the entire statute is preempted by federal law. We therefore affirm the District Court to the extent it found

---

[5] Of course, this holding does not prohibit state officials from communicating with the federal government about an individual's immigration status, since state officials are entitled to do so absent LR 121. *Ga. Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1267 (11th Cir. 2012) ("Pursuant to 8 U.S.C. § 1357(g)(10), state officers may permissibly communicate with the federal government about 'the immigration status of any individual,' even absent a formalized agreement between the locality and federal government.").

LR 121 was preempted by federal law, and we reverse the District Court to the extent it found § 1-1-411(3), MCA, to be severable and sustainable.

¶47 *Did the District Court abuse its discretion by awarding attorney fees to MIJA?*

¶48 The prevailing party in a civil action brought against the State of Montana is entitled to costs and reasonable attorney fees if the court finds that the State's claims or defenses were "frivolous or pursued in bad faith." Section 25-10-711(1)(b), MCA. "A claim or defense is frivolous or in bad faith when it is outside the bounds of legitimate argument on a substantial issue on which there is a bona fide difference of opinion." *Western Tradition P'ship v. AG of Mont.*, 2012 MT 271, ¶ 10, 367 Mont. 112, 291 P.3d 545 (citing *Ostergren v. Dept. of Revenue*, 2004 MT 30, ¶ 23, 319 Mont. 405, 85 P.3d 738) (internal quotations omitted). The Uniform Declaratory Judgment Act also entitles a prevailing party to "supplemental relief," including an award of attorney fees, "whenever necessary or proper." Section 27-8-313, MCA. However, "we have determined that an award of fees to the prevailing party is not warranted in every garden variety declaratory judgment action," and in order to avoid "eviscerating the American Rule," the reach of § 27-8-313, MCA, is "narrow." *Western Tradition P'ship*, ¶ 11 (internal quotations omitted).

¶49 In this case, the District Court did not find the Attorney General's defense of LR 121 to be frivolous or in bad faith. In fact, in its original order denying MIJA's motion for attorney fees, the District Court noted that

> in none of the matters [raised by MIJA] did the State operate in bad faith.
> All of the disagreements between the parties were within the bounds of
> legitimate argument on which there were bona fide differences of

opinion . . . The Attorney General was defending, as is his duty, an enactment passed by 80 percent of the voting citizens of Montana. This topic was one which was important to a large number of Montanans.

We agree with the District Court that the State's defense of LR 121 was not frivolous or in bad faith. MIJA is therefore not entitled to attorney fees under § 25-10-711(1)(b), MCA, and the District Court did not abuse its discretion in so holding.

¶50 However, the District Court reconsidered its denial of attorney fees because it found that our decision in *Svee* "changed significantly" the allowance of attorney fees in declaratory judgment actions. We do not agree. Our holding in *Svee* did not change the rule that "courts analyzing a claim for fees in a declaratory judgment proceeding [must] make a threshold determination that equitable considerations support an award of attorneys' fees." *Western Tradition P'ship*, ¶ 12 (citing *Mungas v. Great Falls Clinic, LLP*, 2009 MT 426, ¶ 45, 354 Mont. 50, 221 P.3d 1230; *Hughes*, ¶¶ 13, 21; *United Nat'l Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 2009 MT 269, ¶ 39, 352 Mont. 105, 214 P.3d 1260). Rather, *Svee* was one of the rare instances in which equitable considerations did support an award of attorney fees in a declaratory judgment action.

¶51 We found that equitable considerations supported an award of attorney fees in *Svee* because

> [t]he Svees sought to accomplish a low-cost repair of their roof in response to a notice from their insurance company about cancellation of their coverage. By so doing, they were named as defendants in both criminal and civil actions filed by the municipal government, in comparison to whom they had significantly less resources to litigate the alleged violation of the ordinance.

28

*Svee*, ¶ 21. That was a very different factual scenario than the one presented in *Western Tradition Partnership*. In *Western Tradition Partnership* we noted that "[t]he courts necessarily must use caution in awarding fees against the State in a 'garden variety' declaratory judgment action that challenges the constitutionality of a statute that the Attorney General, in the exercise of his executive power, has chosen to defend." *Western Tradition P'ship*, ¶ 17. We held in that case that equitable considerations did not support an award of attorney fees even though the plaintiff "vindicated principles of constitutional magnitude" because "the State's defense [of the challenged statute] also was grounded in constitutional principles and in an effort to enforce interests the executive deemed equally significant to its citizens." *Western Tradition P'ship*, ¶ 20.

¶52    *Svee* did not change the law regarding awards of attorney fees in declaratory judgment actions; it merely represents one of the rare instances in which equitable considerations necessitated an award. The case at bar, however, is more like *Western Tradition Partnership* than *Svee*. In this case, the Attorney General exercised his power to defend a legislative referendum that had the support of the vast majority of Montana voters. In defending LR 121, the Attorney General grounded his arguments in constitutional principles, and although he was unsuccessful, his defense of the law was not frivolous or in bad faith. Moreover, LR 121 has not been enforced to date against MIJA's members or anyone else. Central to our award of attorney fees in *Svee* was the fact that the Svees were named as defendants in both criminal and civil actions brought by the City of Helena. While the pre-enforcement nature of this case did not deprive

MIJA of standing, it does weigh against MIJA in an analysis of the equitable considerations regarding an award of attorney fees.

¶53 "We reverse a district court for abusing its discretion only when it acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason[,] resulting in substantial injustice." *Western Tradition P'ship*, ¶ 21 (citing *B Bar J Ranch, LLC v. Carlisle Wide Plank Floors, Inc.*, 2012 MT 246, ¶ 10, 366 Mont. 506, 288 P.3d 228) (internal quotations omitted). Because the District Court read *Svee* as a significant change to the allowance of attorney fees in declaratory judgment actions, and proceeded to award MIJA attorney fees without analyzing the facts of this case in comparison to the facts in *Svee* and the facts in *Western Tradition Partnership*, we hold that the District Court abused its discretion. We reverse the District Court's order awarding "supplemental relief" to MIJA in the form of attorney fees against the State.

## CONCLUSION

¶54 For the foregoing reasons, we affirm the District Court's June 20, 2014 Order granting MIJA's motion for summary judgment to the extent it found LR 121 was preempted by federal law, and we reverse the District Court's Order to the extent it found § 1-1-411(3), MCA, was severable and not preempted. We also reverse the District Court's February 10, 2015 Order awarding MIJA attorney fees.

/S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE


Justice Beth Baker, concurring.

¶55    With respect to the matter of attorney fees, I continue to believe that the Court's decision in *Svee* was incorrect.  The District Court understandably awarded fees to MIJA in light of that ruling.  This case demonstrates, however, that *Svee* was based on its very unique facts, and our Opinion today reaffirms that "'garden variety' declaratory judgment action[s]" do not justify an award of attorney fees under § 27-8-313, MCA.  *Western Tradition P'ship*, ¶ 11 (quoting *Mungas*, ¶ 44).


                                                        /S/ BETH BAKER